558 A.2d 391

STATE of Maryland, DEPARTMENT OF
THE ENVIRONMENT

v.

John Dale SHOWELL III.

No. 61, Sept. Term, 1987.

Court of Appeals of Maryland.

June 2, 1989.

Richard M. Hall, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Linda B. Duff, Staff Atty., on the brief), Baltimore, for appellant.

Raymond S. Smethurst, Jr. (Barbara R. Trader and Adkins, Potts & Smethurst, on the brief), Salisbury, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, McAULIFFE, ADKINS, and BLACKWELL, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals (Retired), Specially Assigned.

COLE, Judge.

In the mid–1970s a significant sewage disposal problem developed in the West Ocean City area of Worcester County, Maryland. A high water table coupled with poor soil for disposing of sewage caused approximately half of the septic tanks actively used by homes and businesses in the area to fail at one time or another. As a result, untreated sewage was spilling into the groundwater of West Ocean City contaminating the drinking water and creating a public health hazard.

In 1976, Worcester County began implementing a state policy requiring seasonal percolation tests in areas having a high water table. This resulted in the denial of eighty to ninety percent of new applications for septic tank permits in West Ocean City, thus limiting the source of the pollution

problem essentially to the homes already constructed in the area. In conjunction with this policy, the Worcester County Sanitary Commission (WCSC) and the Maryland Department of Health and Mental Hygiene (the Department)[1] began to consider various means for providing public sewer service in West Ocean City. Ultimately, the WCSC and the Department concluded that a sewerage system would have to be constructed to convey sewage from West Ocean City to an existing sewage treatment facility in Ocean City proper.

The enormous expense associated with such a project eliminated local funding alone as an alternative and forced the WCSC to seek a construction grant from the United States Environmental Protection Agency (EPA).[2] In response, the EPA conducted an extensive investigation culminating with the release of a Final Environmental Impact Statement (FEIS) in 1983. *See* National Environmental Protection Act, 42 U.S.C. § 4332(C) (requiring analysis of environmental effects if particular project amounts to a major federal action significantly affecting the quality of the environment). The FEIS outlined the significant problems and potential remedies pertaining to West Ocean City and elaborated on the environmental implications of constructing the sewerage system. Specifically, the FEIS

---

1. At the time this suit was initiated, the Department of Health and Mental Hygiene was charged with the general supervision and control over programs affecting the physical condition of the waters of the State of Maryland. *See* Md.Code (1982) § 9–319 of the Health–Environmental Article. In 1987, however, the legislature reorganized this branch of the executive department and created the Department of Environment which assumed a portion of the duties of the Department of Health and Mental Hygiene. *See* Md.Code (1987) §§ 9–252, 9–253, 9–319 of the Environment Article. The Department of the Environment was substituted as a party in this case in July, 1987. However, reference to "the Department" in this opinion is to the Department of Health and Mental Hygiene as established in the Health–Environmental Article in Code (1982).

2. The Federal Water Pollution Control Act, 33 U.S.C. § 1281(g)(1) (1982 & Supp. V 1987), authorizes the EPA to make grants to state and local governments for the implementation of wastewater treatment works.

projected concerns that while the sewerage system would serve to alleviate the immediate groundwater pollution problem associated with the ineffective sewage drainfields, its construction would at the same time promote extensive commercial development in West Ocean City, thereby creating conditions adverse to the 100–year floodplain[3] and wetlands in the area.

The EPA opined that such development would, contrary to the EPA's mission, eventually defeat the purpose of constructing the sewerage system in the first place. Accordingly, the EPA announced that it would only approve the requested construction grant on the contingency that the Department and the WCSC consent to restrictions limiting access to the sewerage system. In particular, the EPA proposed to limit use of the sewerage system to all existing and future structures outside of the 100–year floodplain, to all existing structures within the 100–year floodplain, and to structures to be built in the future within the 100–year floodplain if the land on which they are constructed was platted as a building lot prior to June 1, 1977.[4]

The Department and the WCSC consented to the grant restrictions by executing a consent order on June 8, 1983. Thereafter, the EPA approved a grant of 5.3 million dollars

---

3. The 100–year floodplain encompasses the lowland and relatively flat areas adjoining inland and coastal waters including, at a minimum, that area subject to a one percent or greater chance of flooding in any given year. *See* Md.Code (1974, 1983 Repl.Vol.) § 8–9A–01 of the Natural Resources Article. The Final Environmental Impact Statement reveals that the majority of the land in the West Ocean City project area is covered by environmentally sensitive lands—floodplains and wetlands. Approximately sixty percent of West Ocean City's population resides in the 100–year floodplain.

4. The Final Environmental Impact Statement reveals that the June 1, 1977, date was selected because both Executive Order 11988 (42 Fed.Reg. 26951 (1977)) and a state policy requiring seasonal percolation tests were in effect on that date and served to limit development in West Ocean City. The Executive Order required all federal agencies to avoid direct or indirect support of growth in the floodplains, while the state policy required seasonal percolation testing prior to the issuance of new construction permits in West Ocean City.

to the WCSC; the grant represented seventy-five percent of the entire cost of the project.

John D. Showell, III, owns 39.4 acres of land in West Ocean City. Most of this land is located in the 100-year floodplain. Although Showell owned this tract of land prior to June 1, 1977, the land was never platted for use as a building lot prior to that date. Accordingly, under the consent order, Showell is only entitled to sewer service equal to one residential unit for the entire tract. This lack of sewer service has hampered Showell's development plans; consequently, he filed suit in the Circuit Court for Worcester County questioning the authority of the Department and the WCSC to execute the administrative consent order.

Showell initially filed suit solely against the Department. This suit was dismissed on the Department's motion that the WCSC and the EPA were necessary parties. Showell then amended his complaint naming the WCSC and the EPA as additional defendants. This prompted the EPA to remove the case to the United States District Court for the District of Maryland which subsequently remanded the case for lack of subject matter jurisdiction. Showell then amended his complaint a second time naming only the WCSC and the Department as defendants. Next, the Department's motion to dismiss based on the lack of a necessary party (the EPA) was denied. Showell's motion for summary judgment, however, was granted as to both defendants.[5]

---

5. The brief order for summary judgment read in pertinent part as follows:

Ordered that plaintiff's motion for summary judgment be, and the same hereby is granted in favor of plaintiff and against all defendants. The Court notes that it finds the case of *Cape May Greene, Inc. v. Warren,* 698 F.2d 179 (3rd Cir.1983) controlling in the instant case. Additionally, the Court specifically finds the State of Maryland, Department of Health and Mental Hygiene and the Worcester County Sanitary Commission acted without authority in the execution of the Consent Order dated June 28, 1983, and that the Environmental Protection Agency lacked authority to confer upon the State

In the order granting summary judgment in favor of Showell, the trial judge found *Cape May Greene, Inc. v. Warren*, 698 F.2d 179 (3d Cir.1983), to be controlling and specifically found that the Department and the WCSC had acted beyond their authority. The Department appealed this ruling to the Court of Special Appeals. We granted certiorari prior to consideration by the intermediate appellate court to address the important question presented.

The Department argues that execution of the consent order represented a proper exercise of the authority of the Secretary of the Department ("the Secretary") to protect public health and abate water pollution and that the circuit court's ruling to the contrary is erroneous. In support of this argument the Department emphasizes that the Secretary enjoys broad powers to protect the public health, citing § 9–204(a) of the Health–Environmental Article. In addition to these general powers, the Department directs attention to the more specific grants of power in subtitle 3 of title 9 which relate to the control of water pollution. As the Department sees it, the consent order was clearly a "reasonable remedial measure" executed within the authority of the Department to promote a legitimate governmental objective.

The Department also relies on *Shanty Town Associates Ltd. Partnership v. E.P.A.*, 843 F.2d 782 (4th Cir.1988), to support the argument that the Secretary properly exercised his authority. In *Shanty Town*, the federal appellate court ruled that the Federal Water Pollution Control Act (FWPCA) served to authorize the EPA to impose grant restrictions as to funds earmarked for construction of the West Ocean City sewerage system. The Department reasons that if the EPA was justified in imposing the restrictions, the Secretary was obligated to consent to the restric-

of Maryland, Department of Mental Health and Hygiene and/or the Worcester County Sanitary Commission authority to execute said Consent Order, for the reasons set forth herein and the reasons set forth in plaintiff's memoranda in support of the motion for summary judgment filed in these proceedings.

tions in order to satisfy the Department's statutory man-date of maintaining the quality of the state's waters.

Next, the Department denies that the consent order constitutes a land use restriction. Rather, as previously stated, the Department is of the opinion that the consent order represents a reasonable remedy to existing water pollution and attendant health risks in West Ocean City. The Department contends that it has never asserted that it has the authority to control land use; moreover, the consent order does not preclude development but merely requires that certain tracts of land must have sewage disposal systems independent of the sewer line constructed with funds granted by the EPA. The Department cites *Mont. Co. v. One Park North*, 275 Md. 193, 194–95 n. 1, 338 A.2d 892, 894 n. 1 (1975), for the proposition that in upholding the Department's power to issue sewer moratoria, this Court has focused on the Department's authority to abate water pollution rather than on the indirect effect upon land use such moratoria may have.

Finally, the Department asserts that the circuit court erred in relying on *Cape May Greene, Inc. v. Warren*, 698 F.2d 179 (3d Cir.1983), in granting the order for summary judgment. First, the Department argues that the EPA was not a party to the case below, and thus, the circuit court could not reach the question of the EPA'S authority to impose the grant restriction. Moreover, even if the issue of the EPA's authority was before the circuit court, the facts underlying the *Cape May Greene* decision can be distinguished from the facts *sub judice*.

In the alternative, the Department argues that the EPA was an indispensable party to the lawsuit and that the circuit court abused its discretion in failing to either dismiss the case or issue a protective order in the Department's behalf. The Department contends that it suffered prejudice as a result of the EPA's absence from the suit and that adequate relief cannot be granted to either Showell or the Department unless the EPA is joined as a party.

Showell counters that the Department lacked authority to execute the consent order. First, Showell cites §§ 9–504 and 9–505 of the Health–Environmental Article for the proposition that regulation of access to sewer service is a matter of concern for local governmental units. In Showell's view, the Department is merely empowered to regulate access to sewerage systems to ensure that such facilities are not overloaded. *One Park North, supra,* 275 Md. 193, 338 A.2d 892.

Next, Showell asserts that the Department's execution of the consent order usurped the power extended to local governmental units to control nonpoint source pollution[6] and land use. In this respect Showell cites the Sediment Control Act[7] (Department of Natural Resources (DNR) to adopt soil and shore erosion control programs), the Flood Hazard Management Act[8] (DNR to adopt floodplain management programs) and the Stormwater Management Act[9] (DNR and the Department to consult and adopt a stormwater management plan).

Finally, Showell directs our attention to the Coastal Zone Management Program to support his contention that the DNR, not the Department, is the agency of choice to control nonpoint source pollution. In Showell's view, the Department's authority is essentially limited to the control of point source pollution, i.e., sewage treatment facilities.

---

**6.** "Nonpoint source" pollution is unchanneled and uncollected surface runoff from agriculture, mining, construction roads, urban development, and other diffuse sources. On the other hand, a "point source" is any discernible, confined, and discrete conveyance, such as a pipe, ditch, or channel, from which pollutants may discharge.

**7.** Md.Code (1983 Repl.Vol., 1987 Cum.Supp.) § 8–1001 *et seq.* of the Natural Resources Article.

**8.** Md.Code (1983 Repl.Vol., 1987 Cum.Supp.) § 8–9A–01 *et seq.* of the Natural Resources Article.

**9.** Md.Code (1983 Repl.Vol., 1987 Cum.Supp.) § 8–11A–01 *et seq.* of the Natural Resources Article. (Now codified at § 4–201 *et seq.* of the Environment Article).

Assuming *arguendo* that the Department had the authority to execute the consent order, Showell argues that the Department exercised that authority in an arbitrary and capricious manner. In particular, Showell contends that the EPA imposed the grant restrictions because it felt obligated to discourage sewer-induced development in the environmentally sensitive 100–year floodplain by virtue of Executive Order 11988.[10] Because development of his land allegedly would not create any adverse health hazard nor would it serve to overload the sewer line, Showell believes that the Department's action was arbitrary and capricious.

Showell conceded at oral argument that the EPA had the authority to impose the grant restrictions. Thus, Showell suggests that we need not address the Department's contention that the EPA was an indispensable party. Rather, he asserts that the narrow questions presented are whether the Department had the authority to execute the consent order, and if so, whether that authority was exercised in an arbitrary and capricious manner.[11] We agree with this formulation of the issues.

In granting summary judgment in Showell's favor, Judge Eschenburg found that there was no dispute as to a material fact and that Showell was entitled to judgment as a matter of law. *See City of Baltimore v. Fid. & Dep. Co.,* 282 Md. 431, 386 A.2d 749 (1978); *Brewer v. Mele,* 267 Md. 437, 298 A.2d 156 (1972); *Inmi–Etti v. Aluisi,* 63 Md.App. 293, 492 A.2d 917 (1985); Md. Rule 2–501. We have dis-

10. Executive Order 11988 requires all federal agencies to avoid direct or indirect support of growth in the coastal floodplain. 42 Fed.Reg. 26951 (1977).

11. In contending that the Department acted arbitrarily and capriciously, Showell acknowledges that the Department's actions are not subject to review under the Administrative Procedure Act, Code (1984) § 10–215 of the State Government Article. (Appellee's Brief at 53). Nevertheless, Showell argues that "the action of the Department in this instance should be reviewed in the light of the same standards applied by the Court in reviewing agency decisions under the APA." (*Id.* at 54). We shall assume, *arguendo,* that the "arbitrary and capricious" standard of the APA is applicable in this case.

cerned no dispute between the parties as to a material fact. Accordingly, we limit our review to whether Judge Eschenburg was correct in granting Showell judgment as a matter of law. Before we examine the law relating to the authority of the Department we review the decision of the Fourth Circuit in *Shanty Town.*

In that case, a developer, Shanty Town Associates Limited Partnership (Shanty Town Associates), sought sewer service for a 100–unit hotel which it intended to construct on a 4.5 acre tract of land in West Ocean City. This parcel was located in the 100–year floodplain and was subject to the EPA grant restrictions. When sewer service was denied, Shanty Town Associates filed suit against the EPA.

The federal district court granted summary judgment in favor of the EPA, and Shanty Town Associates filed an appeal to the Fourth Circuit. Shanty Town Associates argued that while the EPA has the general authority to attach conditions to construction grants, it does not have the authority to utilize grant conditions to control nonpoint source pollution and land use in the coastal plains area.

In regard to the EPA's use of grant restrictions to control nonpoint source pollution, the appellate court found that the EPA was given the implicit authority to set up a program of "cooperative federalism" in which the state and federal governments work together to control nonpoint source pollution. Further, there was no indication that Congress intended "to preclude the EPA from imposing conditions on Title II construction grants that are designed to reduce the amount of nonpoint source pollution generated, either directly or indirectly, by the facilities those grants fund." *Shanty Town,* 843 F.2d at 792.

Next, the court addressed Shanty Town Associates' argument that the EPA had impermissibly utilized the grant restrictions to control land use in West Ocean City. In rejecting this contention, the court emphasized that the grant restrictions did not require a ban as to all development in the coastal floodplain. *Cf. Cape May Greene,*

*supra,* 698 F.2d 179. Rather, the "grant restrictions simply forbid the use of *federal funds* to encourage such development." *Shanty Town,* 843 F.2d at 793. The WCSC remains free to permit further development in the 100–year floodplain as long as alternative sewerage systems are utilized.

The court concluded by ruling that the grant conditions were not imposed in an arbitrary and capricious fashion. In this regard, the court distinguished *Cape May Greene,* which was cited by Shanty Town Associates to support its position. First, the EPA grant restrictions in *Cape May Greene* were inconsistent with New Jersey's federally approved coastal zone management plan because they completely precluded future development in the area. On the other hand, the grant restrictions imposed in West Ocean City were consistent with the Maryland Coastal Zone Management Plan and were approved by the Maryland Department of Natural Resources. More important, the grant restrictions were imposed in *Cape May Greene* to control flooding (an improper purpose under the FWPCA) while the grant restrictions were imposed in West Ocean City to control nonpoint source water pollution, a purpose directly related to the goals of the FWPCA. In light of the foregoing, we agree with the Department that the trial judge erred in relying on *Cape May Greene* in granting summary judgment in favor of Showell.

█ With these findings in mind we turn to the Department's contention that the trial court erred in ruling that the Department lacked authority to execute the consent order. At the outset, we recognize that Showell is correct in asserting that the Department has no express authority to restrict access to a public sewerage system. *See* 60 Op.A.G. 508, 513 (1975); *see also Loan Corporation v. Baltimore,* 175 Md. 676, 3 A.2d 747 (1939). However, the Secretary of Health and Mental Hygiene possesses broad powers to regulate sanitary facilities and pollution control measures. Thus, this issue boils down to a matter of statutory construction.

Our primary goal is to ascertain and effectuate the intent of the General Assembly. *Dean v. Pinder*, 312 Md. 154, 161, 538 A.2d 1184, 1188 (1988); *Kaczorowski v. City of Baltimore*, 309 Md. 505, 512–13, 525 A.2d 628, 632 (1987). When the statute in question is ambiguous we are obligated to adopt the construction which promotes the most reasonable result in light of the objectives and purpose of the enactment. *Kaczorowski*, 309 Md. at 513–14, 525 A.2d at 632. It has been said that state statutes, authorizing local governmental units to accept federal grants and make contracts containing such terms as are deemed necessary to obtain federal aid, must be liberally construed. 64 Am. Jur.2d, *Public Works and Contracts* § 3, at 846 (1972).

In respect to the scope of the Department's powers, § 9–204(a) of the Health–Environmental Article provides that "[t]he Secretary has general supervision and control over the waters of the State,[12] insofar as their sanitary and physical condition affect the public health or comfort and may make and enforce rules and regulations and order works to be executed to correct and prevent their pollution." As to existing sewerage systems, the Secretary may "[c]ompel their operation in a manner that will protect the public health and comfort." § 9–204(b)(1). In addition, the Department is designated as the State Water Pollution Control Agency in the State of Maryland for purposes of the FWPCA, which provides grants for the construction of necessary treatment works to prevent and control water pollution. § 9–228. In relation to this appointment, the Department may enter into joint financing agreements with local governments for the utilization of federal grants. § 9–203(c).

Subtitle 3 of title 9 of the Health–Environmental Article provides "additional and cumulative remedies to prevent, abate, and control pollution of the waters of this State."

___

12. A definition of "waters of this State" is provided at § 9–101(*l*) of the Health–Environmental Article and includes surface as well as groundwaters.

§ 9–302(a). The Department must cooperate with agencies of other states and the federal government in carrying out the objectives of the subtitle. § 9–302(c). In addition, § 9–319 outlines miscellaneous powers and duties of the Department in regard to the implementation of subtitle 3. The provisions of particular importance to this discussion include § 9–319(a)(4) and (a)(7). Subsection (a)(4) requires that the Department "accept and administer loans and grants from the federal government ... to carry out any of the Department's functions," and subsection (a)(7) empowers the Department "to adopt any other reasonable remedial measures to prevent, control, or abate pollution or undesirable changes in the quality of the waters of this State."

The Department contends that these general powers support a finding that the Department had the implicit authority to execute the consent order at question in this case. We agree.

There is no dispute that the failing septic tanks were polluting the groundwater in West Ocean City and that the situation was detrimental to the public health and comfort. Under the circumstances, the Secretary was compelled to act under both subtitles 2 and 3 which mandate, respectively, that the Department regulate sanitary facilities and control water pollution. Moreover, under each of these enactments the Department is required to cooperate with the federal government in regard to the acceptance and administration of monetary grants. As we see it, the Department made a rational determination, along with the WCSC, that the federal grant proposal presented the most viable alternative available to abate the deteriorating environmental conditions in West Ocean City. To the extent that the grant restrictions imposed by the EPA were valid, the Department essentially was confronted with an all or nothing proposition: consent to the grant conditions or forego federal funding for the project. In this respect, execution of the consent order was a valid exercise of the implicit powers necessary to further the Department's mission of preventing water pollution.

We reject Showell's argument that regulation of access to sewer service is purely a matter for local control. The United States District Court for the District of Maryland has previously held that the Department is empowered to issue sewer moratoria which are rationally based and reasonable in length of imposition. *See Smoke Rise, Inc. v. Washington Suburban San. Comm'n,* 400 F.Supp. 1369 (D.Md.1975); *see also* 60 Op.A.G. 503, 513 (1975) (The Department has the authority to restrict access to sewerage systems by virtue of its power of review of local sewerage plans.). Moreover, even if Showell's argument is true, he overlooks the fact that the WCSC, a local authority, also consented to the grant restrictions.

We likewise reject Showell's assertion that the consent order amounts to a usurpation of the power of local governmental entities to control nonpoint source pollution and land use. In respect to this argument one must distinguish between the factors which motivated the actions of the EPA and those motivating the Department. It is clear that the EPA sought to control the proliferation of nonpoint source pollution which would follow as a by-product of sewer-induced development of West Ocean City. *See Shanty Town,* 843 F.2d at 792. However, the EPA did not attempt to directly control land use in West Ocean City. *Id.* at 793. On the other hand, the Department acceded to the demands of the EPA with the intent of ensuring that the groundwater in West Ocean City would no longer be polluted by sewage flowing from inefficient septic tank drainfields, thus alleviating a significant public health hazard. As we see it, any effect which the Department's consent order has on the control of nonpoint source pollution and land use is merely incidental to the Department's valid regulation of the water pollution problem at hand. Further, the effect of the consent order on land use is at best indirect in that Showell is not precluded from developing his land and installing a private sewerage system.

■ Finally, the Department's decision to execute the consent order was neither arbitrary nor capricious. As

previously discussed, in regulating with the objective of protecting the quality of the state's waters the Department is validly exercising its authority. Comments of the federal district court in *Smoke Rise,* 400 F.Supp. at 1383–84, in regard to the legitimacy of sewer moratoria orders issued by the Department, are appropriate in regard to the reasonableness of the consent order under attack in the case *sub judice.* The court stated:

> The legitimacy of the state's purpose in protecting its waters from contamination by sewage overflows requires little discussion. The lesson of history is clear; it is reasonable, if not essential, that the state act to prevent the pollution of its waters by human wastes and the epidemics of disease which flourish under such conditions.

The court went on to hold that sewer moratoria orders of five years duration were reasonable. In this case, while execution of the consent order was reasonably necessary to achieve the public goal of abating the ongoing pollution of the water in West Ocean City, its operation was not unduly oppressive upon Showell.

Therefore, as we see it, even though the value of Showell's land will probably decrease without access to the federally-funded sewerage system, the land is not worthless. In fact, Showell is still entitled to sewer service equivalent to one dwelling unit under the consent order. Further, there is some indication in the record that portions of Showell's land might pass the requisite seasonal percolation tests and, thus, these parcels could be developed notwithstanding a lack of access to the federally-funded sewerage system. Finally, Showell always has the option of installing a private sewerage system to accommodate development on his tract of land. In light of these alternatives, we are not prepared to hold that the consent order is unduly oppressive. To the contrary, we find that execution of the consent order was a reasonable means to promote a legitimate end. The burdens on Showell's rights are necessary and not unreasonable to promote the general public health

and welfare in West Ocean City. Thus, the order was not arbitrary and capricious.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR WORCESTER COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.