607 A.2d 66

**SHANTY TOWN ASSOCIATES LIMITED PARTNERSHIP**

v.

**DEPARTMENT OF THE ENVIRONMENT.**

No. 1139, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Filed Oct. 15, 1991.*

Refiled May 27, 1992.

Certiorari Denied Oct. 7, 1992.

---

\* Editors Note: The Opinion filed October 15, 1991 is published at 89 Md.App. 1, 596 A.2d 1079.

**104**

Raymond S. Smethurst, Jr. (Barbara R. Trader and Adkins, Potts & Smethurst, on the brief) Salisbury, for appellant.

Lucy A. Cardwell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Nancy Young, Asst. Atty. Gen., on the brief) Baltimore, for appellee.

Argued before GARRITY and CATHELL, JJ., and DARLENE G. PERRY, Judge, Specially Assigned.

DARLENE G. PERRY, Judge, Specially Assigned.

Appellant, Shanty Town Associates Limited Partnership (Shanty Town), appeals from an order of the Circuit Court for Worcester County affirming the denial by Appellee, Maryland Department of the Environment (MDE), of Shanty Town's application for increased sewer service to support the proposed expansion of its West Ocean City commercial facilities.

The controversy centers on the interpretation of a consent order entered into by the Maryland Department of Health and Mental Hygiene (Department)[1] and the Worcester County Sanitary Commission (WCSC) which restricts access to the sewer system. MDE construed the consent order as barring Shanty Town's request for additional sewage discharge. The Circuit Court affirmed, ruling that the agency decision was supported by substantial evidence.

We affirm the circuit court, but for other reasons which preclude the need to address the question of substantial evidence.

BACKGROUND

The consent order at issue was the product of a WCSC plan to install a central sewage collection system for the West Ocean City area. Such a system was needed to

---

**1.** At the time of Shanty Town's initial application for expanded sewer service in 1983, responsibility for supervision and control over matters concerning the physical condition of State waters was vested in the Department of Health and Mental Hygiene. *See* Md.Code Ann. Health–Environmental § 9–319 (1982). Subsequently, however, the legislature created the Department of the Environment, which assumed authority over these matters effective July 1, 1987. *See* Md. Code Ann. Environment §§ 9–252, 9–253, 9–319 (1987). Accordingly, the Department of the Environment was substituted as a party shortly thereafter. In this opinion, reference to "the Department" is to the Department of Health and Mental Hygiene and reference to "MDE" is to the Department of the Environment.

replace the existing private on-site septic systems which had become a major sanitation problem by the late 1970's. Due to the considerable expense involved, however, WCSC was forced to seek aid from the federal government in the form of an Environmental Protection Agency (EPA) construction grant. The EPA conducted a comprehensive study addressing the potential environmental impact of the proposed system, concluding that the system would be environmentally sound only if excessive development within the 100–year floodplain and the wetlands was prevented once it was in place.

As a result, the EPA conditioned approval of the grant on restrictions limiting access to the system. Those restrictions were formalized in a duly executed Assistance Agreement (Agreement) between the EPA and WCSC. As a further condition, the EPA sought assurance that State authorities would enforce the terms of the agreement. The EPA agreed that this demand would be met should the Department and WCSC enter into an appropriate consent order. After a series of meetings attended by representatives of the Department, WCSC, and numerous environmental groups, the consent order was signed on June 28, 1983. A construction grant was then issued by the EPA and the system ultimately installed.

The consent order begins with a preamble setting forth a six-part policy embodying the desired restrictions on sewer service. The order also requires that WCSC prepare a map depicting the respective boundaries of the areas affected by the restrictions, i.e.; the wetlands and the 100–year floodplain of the West Ocean City Sanitary District. The remaining provisions relevant to this appeal set forth the standards upon which an application for sewer service is to be considered and the procedure by which an unsuccessful applicant may pursue a grievance.[2]

---

2. These provisions state:
 Section 2a. Through delegation of authority, the Health Officer of Worcester County will be the responsible party in deciding, based on

The Shanty Town property consists of an island and causeway of approximately 4.5 acres situated within the West Ocean City Sanitary District. It is zoned B–2 (General Business District). The property is currently improved with a complex of interconnected shops and restaurants as well as boat mooring facilities, with the remainder of the land consisting primarily of a parking lot. These improvements were constructed in 1974–75. Shanty Town seeks to expand the complex by constructing a condominium hotel and adding approximately 20,000 feet of new store space. This case arose when Shanty Town applied for and was refused the additional sewer service that the proposed expansion would require.

It is undisputed that the Shanty Town property lies within the 100–year floodplain located in the geographical area encompassed by the consent order. The parties likewise agree that the Department acted within its authority in executing the consent order and that the same is controlling in this case. *See Department of Environment v. Showell,* 316 Md. 259, 558 A.2d 391 (1989).[3] The conflict herein, rather, involves the interpretation of two of the six policy provisions contained in the consent order. Those provisions read as follows:

*Paragraph A.*

Sewer service will not be permitted for the undeveloped lots in the 100–year floodplain as defined by the Federal

---

the sewer service policy presented heretofore and on the information contained in the approved map and its accompanying underlying structure, whether a structure or a parcel of platted land is allowed sewer service.

Section 2b. Should any aggrieved applicant challenge the decision of the Health Officer, the matter will be referred to the Director of Maryland's Water Management Administration (WMA) for review. Any appeal beyond the level of WMA will be administered in accordance with the procedures of the Administrative Procedure Act.

3. In *Showell,* the Court of Appeals held that the Department had the implicit authority under its general statutory powers to execute the consent order as necessary in furtherance of the prevention of water pollution.

Emergency Management Administration (FEMA), unless the lots were platted as building lots prior to June 1, 1977. Development on a lot for which sewer service will be permitted will be limited to one equivalent dwelling unit (EDU). For the purpose of this Order, an EDU is defined as any non-single family dwelling unit having a sewage flow associated with a residential dwelling unit (280 gallons per day).

\* \* \* \* \* \*

*Paragraph C.*

No sewer service or connections will be provided for any structure in the floodplain area not included in the West Ocean City service area as defined in the March, 1982, edition of Amendment # 1 to the North Central Ocean Basin (NCOB) Wastewater Facilities Plan.

The initial decision on Shanty Town's application was made by Dr. Donald Harting, Deputy State Health Officer, who denied additional sewer service on the ground that the property had not been previously platted into individual lots (i.e., prior to 1977). Shanty Town appealed to Richard B. Sellars, Jr., Director of the Water Management Administration (WMA), who had been an active participant in the drafting of the consent order. Sellars affirmed Dr. Harting in a written response, adding that the drafters never intended to provide expanded service to developed lots. The next step in the process was a full evidentiary hearing before William F. Clark, Chief Hearing Examiner of the Department. Examiner Clark found that, while the Shanty Town property was in fact platted before June 1, 1977, the estimated additional flow of 30,000 gallons per day was far in excess of that permitted by Paragraph A of the consent order. Accordingly, he recommended that the appeal be denied.

The final administrative proceeding consisted of oral arguments before Kenneth E. McElroy, Jr., Designee of the Secretary of MDE. By written order dated January 15, 1988, Designee McElroy made the following findings relevant to this appeal: (1) that the language of the consent

order, being clear and unambiguous, should be given its plain meaning without consideration of extrinsic evidence; (2) that Paragraph A is irrelevant because it applies only to undeveloped lots and, assuming the property constitutes a single lot, there had been commercial development since 1974; (3) that Paragraph C, rather, is dispositive in that its plain meaning dictates that no sewer service be provided for structures erected after 1982; (4) that the result would be the same even if the consent order were determined to be ambiguous; and (5) that the restrictive provisions of the consent order should be viewed not as six exceptions to some other overall policy, but rather as *the* policy, to be read as a cohesive whole. In accordance with these findings, MDE subsequently entered a final denial of Shanty Town's application.[4]

Shanty Town appealed to the Circuit Court for Worcester County, where the case was assigned to Judge Theodore R. Eschenburg. On appeal, Shanty Town contended that the Designee's decision was erroneous because the plain meaning of the consent order does not preclude Shanty Town from obtaining the additional sewer service for which it applied. Upon reviewing the record, Judge Eschenburg rejected that argument, affirming the Designee's interpretation of the consent order on the ground that substantial evidence supported the factual findings and there was no error of law.

DISCUSSION OF LAW

The standard and scope of review by which the Circuit Court was bound is set forth in the Maryland Administra-

---

**4.** Initially, this ruling was made contingent on the outcome of *Showell,* supra. In *Showell,* the Circuit Court for Worcester County had held that the Department lacked the authority to execute the consent order. On appeal, the Court of Appeals granted certiorari prior to consideration by this Court and had yet to rule at the time of Designee McElroy's Final Order of January 15, 1988. Accordingly, by its own terms the Order was stayed, to become effective thirty days after a decision in *Showell.* The Court of Appeals subsequently upheld the validity of the consent order by opinion dated June 2, 1989, thereby triggering final denial of the application by MDE.

tive Procedure Act, Code (1984) § 10–215 of the State Government Article. Under subsection (g)(3), a reviewing court may:

"reverse or modify the decision [of the agency] if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious."

 Under Maryland law, "substantial evidence" is such relevant evidence that a reasoning mind could accept as a proper basis for the conclusion reached by the agency. *Caucus v. Maryland Securities,* 320 Md. 313, 577 A.2d 783 (1990); *Maryland State Police v. Lindsey,* 318 Md. 325, 568 A.2d 29 (1990). A reviewing court must not substitute its own judgment for that of the agency, whose expertise is presumed, but rather exercise "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *Caucus,* supra., 320 Md. at 324, 577 A.2d at 78Ɛ (quoting *Supervisor v. Asbury Methodist Home,* 313 Md. 614, 625, 547 A.2d 190, 195 (1988)). In *State Election Board v. Billhimer,* 314 Md. 46, 58, 548 A.2d 819 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989), the Court of Appeals elaborated upon the degree of deference to be accorded a final agency decision:

This deference applies not only to agency fact finding, but to the drawing of inferences from the facts as well.... *When, however, the agency's decision is predicated solely on an error of law, no deference is appro-*

*priate and the reviewing court may substitute its judg-
ment for that of the agency....*

Shanty Town contends that the Designee's interpretation
of Paragraph C of the consent order is erroneous as a
matter of law. We agree but affirm for different reasons.

We hold, as did both the Designee and the Circuit
Court below, that the language of the consent order is clear
and unambiguous. Where such is the case, all terms are to
be given their plain meaning in construing the order.
*Roged, Inc. v. Paglee,* 280 Md. 248, 372 A.2d 1059 (1977).

Paragraph C is plain in its meaning. It neither precludes
nor permits the relief sought by Shanty Town. The para-
graph is geographically, not structurally, restrictive.

A specific detailed plan preceded the Agreement and the
consent order so that the grant could be given for a system
to service a known geographical area and known sewer
usage. Paragraph C precludes service in the floodplain
unless the area was included in the West Ocean City service
area as of 1982. Recalling that the new system was intend-
ed to alleviate failing septic systems in a specific area, it
was the obvious intent of the framers of the consent order
to identify and restrict the geographical area the new
system would serve. Read as a part of the entire order,
there is nothing in the intent of the order to suggest that, in
the converse, the intent of Paragraph C is to grant unlimit-
ed service to all structures within the described geographi-
cal area, as well as any future expansion to those struc-
tures. Paragraph C simply does not apply.

Because of the previous lengthy administrative
and judicial controversies which have been spawned by this
situation,[5] we will go further than simply addressing the
application of Paragraph C.

Maryland Rule 8–131(a) provides in part

---

5. *Shanty Town Associates Ltd. Partnership v. E.P.A.,* 843 F.2d 782 (4th
Cir.1988); *Dept. of Environment v. Showell,* 316 Md. 259, 558 A.2d 391

*Generally* ... Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

As the court held in *Hewitt v. State*, 242 Md. 111, 218 A.2d 19 (1966) and *Zellinger v. CRC Development Corporation*, 281 Md. 614, 380 A.2d 1064 (1977), one of the purposes of this section is to prevent the trial of cases in a piecemeal fashion, thereby saving time and expense and accelerating the termination of litigation. The interest of justice is best served if there are not piecemeal appeals.

The case at bar is peculiarly appropriate for the exercise of the discretionary guidance allowed by Section (a) because the facts are not in dispute, the record below is complete, both appellant and appellee have had full opportunity in this court to brief and argue the application and significance of both Paragraph A and Paragraph C of the consent order, and the only issues before us involve the legal interpretation of the consent order. Additionally, this case has come through several stages of administrative proceedings prior to the Circuit Court hearing, and the record is rife with opinions on the legal interpretation of the consent order, evidencing the full opportunity of both sides to fully present all relevant issues. Further piecemeal treks through the appeal labyrinth would serve neither justice, convention, nor common sense.

With that prelude, we address the significance of Paragraph A of the consent order as it applies to Shanty Town's application.

It is clear that Paragraph A concerns itself only with sewer service to be allotted to those specified undeveloped building lots upon which development may occur in the

---

(1989); and the administrative and judicial proceedings leading to these two decisions.

future. In effect, this paragraph reserves a sewer allotment of 280 gallons per day to each undeveloped lot platted as a building lot prior to June 1, 1977.

This paragraph cannot be construed to mean that any developed lot now in existence could be re-developed and obtain an additional allowance of one EDU for each newly constructed addition. Such an interpretation would allow construction at will to deplete the future reserves intended for undeveloped property.

The appellant urges upon us a view that, because redevelopment to existing developed lots is not specifically addressed in the consent order, Shanty Town is not limited in the amount of sewer allotment which may be granted. That argument will not succeed. Such an interpretation is at odds with the intent and purpose of the consent order, which was entered into after extensive environmental impact studies which concluded that the system would be sound only if excessive development within the 100–year floodplain and the wetlands was prevented once it was constructed. The EPA conditioned its approval upon restrictions limiting access to the system, and further required assurances that the terms of the order would be enforced.

Read as a whole, the consent order forbids rather than allows sewer allotments not addressed by its terms. It is a restrictive document which seeks to alleviate failed systems within a defined geographical area of wetlands and floodplain, to allow for limited future development reserves, and to restrict development in its service area. The evidence in the record discloses that during negotiations leading to the Agreement and the consent order, the subject of expansion of existing development was not discussed. Clearly, it was not a factor in the anticipated service capacity for the new system and was not intended to be included.

EPA, concerned that the new sewer system, while alleviating the immediate problem of sewage contaminated groundwater, would promote extensive commercial develop-

ment in West Ocean City which would create conditions adverse to the 100–year floodplain and wetlands in the area, insisted upon limiting the use of the new system to all existing and future structures within the 100–year flood-plain, and to structures to be built in the future within the 100–year floodplain if the land on which they are constructed was platted as a building lot prior to June 1, 1977. (*Dept. of the Environment v. Showell, supra.* See also footnote 4.)

*Showell* did not succeed in his attempts to thwart the restrictions of the consent order. Neither will Shanty Town. While such a holding may seem a harsh result to contemplated development, the result is not to preclude it, but merely to require that development which does not fall within the allowed usage set out in the consent order must provide for a sewage disposal system independent of the system built with EPA funds.

Paragraphs B, D, E, and F of the consent order have no application to this inquiry. Paragraph B precludes sewer service for structures in a wetland. Although the Hearing Examiner states that some portion of Shanty Town's 4.5± acres are in wetlands, there is no suggestion that its request was denied because any of the proposed structures were to be located in wetlands. We held earlier Paragraph C is a geographical limitation and that the appellant's property is inside its bounds; it is within the 100–year floodplain of the defined West Ocean City service area. Paragraph D's prohibition of a particular sewer line extension is inapplicable because the appellant's property is already served by an authorized sewer line. Paragraph E's restriction is inapplicable because the Shanty Town site is not industrially zoned. Paragraph F merely precludes service to structures located outside the defined geographical boundaries of the service area unless the agreement of the WCSC and the EPA are obtained. The remainder of the consent order concerns itself with procedural requirements for the implementation of its policies.

 There is no necessity for this court to review the evidence heard by Designee McElroy to determine whether it was substantial and therefore could have supported the conclusion reached. The error made was one of law, i.e.; an incorrect interpretation and application of Paragraph C of the consent order. Where the error made is one of law, the reviewing court, under the provisions of Annotated Code of Md., State Government Art., § 10–215 (1984) may reverse or modify the decision of the agency for that reason alone.

Although the Designee and the court below were erroneous in their reasoning, we shall affirm the result which denied the appellant's application for expanded sewer allotment.

AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.

CATHELL, J., dissents.

CATHELL, Judge, dissenting.

I respectfully dissent.

The majority concludes:

> There is no necessity for this court to review the evidence heard by Designee McElroy to determine whether it was substantial and therefore could have supported the conclusion reached. The error made was one of law, i.e.; an incorrect interpretation and application of Paragraph C of the consent order.

I agree with the majority that there was an error of law. The majority further concludes that:

> [T]he designee and the court below were erroneous in their reasoning....

I also agree. Thus, the designee and the court below were wrong in their reasoning and in their application of the law. Nevertheless, the majority affirms. As I previously indicated in a dissent to a prior incarnation of the majority's opinion, I believe it to be inappropriate for us, under the facts of the case, to affirm a decision never made below.

Reversal, not affirmance, is appropriate where the lower court applied the wrong law and used the wrong reasoning.