Dear Board of County Commissioners
You have requested our opinion concerning the law governing the County's extension of its sewerage system to subdivisions on Kent Island, where many properties have failing septic systems. State funding for this extension would apparently be limited to providing service to developed properties. However, in some of the same subdivisions there are undeveloped lots that are barred by regulation from employing individual septic systems due to lot conditions. State law generally requires that a county sanitary commission provide a connection to a sewerage system for all properties abutting the road or right-of-way in which a sewer line is placed. With reference to four scenarios, you have asked about the extent to which the County may limit new service coincident with the limitations on State funding.
We have taken the liberty of summarizing and reordering your questions for purposes of analysis. Specifically, you have asked:
1. If vacant lots are interspersed among occupied lots within a subdivision and front on the roads and rights-of-way in which the sewer lines will be installed, may the vacant lots be excluded from service?
2. May vacant lots be excluded from service if the lots do not front on the roads and rights-of-way in which sewer lines will be installed? For example, if a block consists of vacant lots on both sides of the street, must the County place a sewer line along the street to serve those lots?
3. Assume that vacant lots interspersed with occupied lots front on the roads and rights-of-way in which the sewer lines will be installed. Assume also that these lots are unbuildable under current septic system regulations, but that development of the lots might be approved if alternative technologies for sewage disposal are employed or if lots are combined to create larger lots that can use conventional septic systems. May these lots be excluded from service? Once the lots become buildable, would the County be required to provide connections to the system for these lots?
4. May the County exclude from service those farms and woodland areas that front interceptor lines that will connect subdivisions to the treatment plant?
For the reasons explained below, we conclude:
1. The County will be required to provide a connector for each vacant lot within a service area that is interspersed among developed lots along a right-of-way in which a sewer line is laid. Nonetheless, sewerage service may not necessarily be available for every such lot. For example, the County might impose a moratorium or other restriction on service for new development because of utility-related reasons such as insufficient treatment plant capacity or the Secretary of the Environment might impose restrictions on new connections for the protection of waters of the State. Absent such restrictions, however, the owner of the vacant lot would be eligible for sewerage service.
2. The County is not necessarily obligated to provide service to a street with vacant lots. Under State law, a sanitary commission may determine the extent of sewerage services by defining its service area. If there is no current need for a sewer line along a street and it would be feasible to design a system without laying a line along that street, the street could be excluded from the defined service area.
3. Consistent with our answer to the first question, the County would be required to provide a connector for each vacant lot within a defined service area, even if an alternative sewage disposal technology were available or a combination of that lot with another would make a septic system technically feasible. Under State law, a lot owner may not use a traditional septic system or an alternative technology for sewerage service within a sanitary district if a public sewerage system is available. Thus, if vacant lots interspersed among developed lots are within the service area, neither traditional septic systems nor alternative technologies may be used. On the other hand, if public sewerage service is unavailable due to other factors, the lot owner may be able to combine lots in a manner that would allow construction of an individual septic system or employ alternative technology for sewage disposal.
4. A sanitary commission is not required to provide sewerage service outside defined service areas. The placement of an interceptor line necessary to connect a service area to a treatment facility does not make properties outside the service area that abut that line eligible for sewerage service. Thus, the County would not be required to provide service to the woodlands and farms mentioned in your question.
 I Background
Queen Anne's County is considering an extension of its wastewater collection or sewerage system to several subdivisions where lots are currently served by individual septic systems. Many of those individual systems are failing, and thus cause or threaten environmental and health problems. The extension of sewerage service would likely take place in several phases over a number of years.[1] We understand that the affected subdivisions are not within "priority funding areas," as defined in the State's Smart Growth Law.
As explained in your letter, the opening of the initial span of the William Preston Lane, Jr. Memorial Bridge brought with it considerable land speculation in Queen Anne's County during the 1950s, particularly on Kent Island, where approximately 7200 lots were platted and recorded. At the time, the County lacked zoning regulations. Some of the lots were improved, relying on individual wells and septic systems. While the County extended its sewerage system to a significant number of properties in 1980, many lots continue to rely on septic systems, which have degraded over time.
To give an example of the current need for sewerage service, you noted that two subdivisions, Kent Island Estates and Romancoke, have been identified for future sewerage service since the County adopted its first comprehensive water and sewer plan in 1979. These two communities currently include approximately 765 homes and 820 vacant lots. The Queen Anne's County Health Department, Environmental Health Division, estimates that 80% of existing septic systems in these two subdivisions meet the State's definition of a failed septic system. Many of the vacant lots would not be able to sustain a septic system under current standards, because of the high water table, poor soil drainage, and small lot sizes. In fact, only six of the 820 vacant lots have approved percolation tests.
We understand that you have met with representatives of the Maryland Department of Planning concerning the extension of sewerage service to areas in need, the application of the State's environmental and Smart Growth statutes, and the availability of funding assistance. From those discussions, you believe that State funding would be available for extension of a sewerage system to serve existing developed lots with failing septic systems, but that State funding would not be available to serve new development or vacant lots or other properties along the path of the sewerage system.
You point out that State law requires a county sanitary commission to provide services to abutting property owners. See Annotated Code of Maryland, Environment Article ("EN") § 9-601
et seq. You are concerned about reconciling this mandate with the limitations on State funding and ask for our opinion on your obligation to provide service.[2]
 II Effect of Smart Growth Law
The legal memorandum accompanying your letter[3] asserts that a limitation on State funding for a project to connect a sewerage system to vacant lots abutting the proposed system "appears to be directly in conflict with the State's mandate that the County provide sewer service to all abutting parcels when it installs a new line." The restriction on State funding to support new development is premised on what is commonly referred to as the State's "Smart Growth Law," codified primarily in the Annotated Code of Maryland, State Finance and Procurement Article ("SFP") § 5-7B-01 et seq. Subject to some exceptions, the Smart Growth Law restricts State funding for growth-related projects to those within "priority funding areas"[4] and limits State funding for growth-related projects outside those areas. SFP § 5-7B-04(a).[5] We understand that the subdivisions in question are not in one of the County's priority funding areas.
The availability of funding is no doubt a key factor in the County's decision to proceed with construction of sewerage infrastructure. Nonetheless, the County's obligations under State law to serve certain properties and the availability of State funding for such services are distinct issues. As we have previously explained, "the [Smart Growth] statute does not prohibit altogether development of growth-related projects or restrict the authority of private developers or political subdivisions to undertake such projects. Rather, it simply prohibits the State from subsidizing such projects outside of designated areas." 84 Opinions of the Attorney General 33, 34 (1999).
 III Sanitary District
A. Generally
The Queen Anne's County Sanitary District is established by local law. PLL § 24-1.A. The enabling authority for that law is set forth in State law. EN § 9-601 et seq. A sanitary district is "a public corporate body that exercises public and essential government functions, for the public health and welfare." EN § 9-607(a). It is established pursuant to the police powers of the State. 58 Opinions of the Attorney General 186, 189 (1973). Except as limited by Title 9, Subtitle 6 of the Environment Article, a sanitary district has all the powers granted to Maryland corporations under the General Corporation Law. EN § 9-632(b).
The governing body of a sanitary district is a sanitary commission. EN § 9-621. In Queen Anne's County, the County Commissioners sit as the District's Sanitary Commission. PLL § 24-4.A.
Among other powers, a sanitary district may acquire, construct, and operate a sewerage system. EN §§ 9-601(j) and (n), 9-607(b), and 9-665. A sanitary district has county-wide authority. In considering the provision of services, a sanitary commission may create or alter individual service areas and service subareas within the district. EN §§ 9-647, 9-648, and 9-652. A "service area" is a "defined geographic area that is established as a service area by a sanitary commission under [Title 9, Subtitle 6 of the Environment Article]." EN § 9-601(l).
To carry out its duties, a sanitary district may acquire real property. EN § 9-668. Subject to limited exceptions, a sanitary district may acquire property by eminent domain. EN § 9-633. It may accept grants, EN § 9-638; borrow money from government agencies, EN § 9-640; and set benefit assessments, connection charges, and service charges, EN §§ 9-656, 9-658, and 9-662.
A sanitary district may classify property for assessment purposes in accordance with State law. EN § 9-657. Except for property classified as agricultural,[6] benefit assessments may be applied to any property that abuts a sewer line, regardless of whether the property is improved or unimproved. EN § 9-656(c).[7] A sanitary district may issue tax exempt bonds to finance a project. EN §§ 9-608(b) and 9-682 et seq. If benefit assessments are inadequate to cover debt service in the next taxable year, an ad valorem tax may be imposed on property in the service area to cover any deficiency. EN § 9-694.
B. Obligation to Provide Service
A sanitary district is a public utility.[8] Normally, it acts as the sole provider of sewerage service in a locale. See 11 McQuillin, The Law of Municipal Corporations § 31.17 (3rd ed. rev. 2000). The Legislature contemplated that sanitary districts would operate sewerage systems as monopolies. Highfield Water Co. v. Pub. Serv. Comm'n, 488 F. Supp. 1176, 1190 (D. Md. 1980).
Public utility status implies a duty to provide sewerage service without discrimination. As the Court of Appeals has stated:
 It is axiomatic that a public service corporation, private or municipal, is under a duty to furnish to all persons applying therefore the service which it offers without discrimination ... where the service requested is within the reasonable range of its plant, equipment, lines or mains.
Home Owners' Loan Corp. v. Mayor City Council of Baltimore,175 Md. 676, 680, 3 A.2d 747 (1939); see also Bair v. Mayor City Council of Westminster, 243 Md. 494, 498, 221 A.2d 643 (1966). In the case of a sanitary district, the General Assembly has defined this obligation in legislation.
When constructing a sewer line, a sanitary commission "at its own expense, shall construct a connector to the property line of each parcel that abuts the way in which the ... sewer line is laid." EN § 9-661(a)(1). In most districts, that obligation pertains to both improved and unimproved properties.[9] When construction is complete, the sanitary commission must give notice to each abutting property owner. EN § 9-661(b). "On receipt of the notice of completion and by a time set by the sanitary commission," the owner is required to pay the appropriate connection charge and connect to the sewerage system. EN § 9-661(c). These provisions are mandatory, and the only discretion accorded the sanitary commission is the timing of the connection. The obligation under EN § 9-661 to construct connectors pertains to sewer lines within a service area only if the lines are designed to serve individual properties; it does not apply to interceptor lines designed primarily to carry the sewage collected by the system to a treatment facility.
A sanitary commission must also provide a property owner whose property does not abut a sewer line with a connection to the sewerage system at the property owner's request. EN § 9-659. However, this obligation extends only to properties within the defined service area. The law sets forth criteria that the sanitary commission must consider in defining a service area:
 ... in considering a proposed service area, the sanitary commission ... may not create or change a service area unless they find that the creation or change:
 (1) Is necessary for the existing and future health, safety, and welfare of the public in general; and
 (2) Is feasible financially and from an engineering standpoint.
EN § 9-647(b).[10] A sanitary commission has discretion whether to extend any project to property outside a defined service area. EN § 9-666.
Other factors may affect the availability of public sewerage service. For example, if the sanitary commission lacked sufficient treatment capacity at the time new sewer lines were installed, it could declare a moratorium or impose restrictions that delay connections for new development for a reasonable period. See, e.g., Ungar v. State, 63 Md. App. 472, 492 A.2d 1336 (1985), cert. denied, 475 U.S. 1066 (1986) (upholding sewer moratorium against constitutional challenge); see also 2 Rathkopf, The Law of Zoning and Planning § 15:27 (4th ed. rev. 1978).[11] Furthermore, to safeguard against water pollution, the Secretary of the Environment might restrict sewerage service to undeveloped properties, through a grant condition in connection with State or federal funding or through an administrative or judicial enforcement action. See, e.g., Dep't of Env't. v. Showell, 316 Md. 259, 558 A.2d 391 (1989) (recognizing Department's authority to execute consent order to further prevention of water pollution). In fact, a county is prohibited from approving a subdivision plat or granting a building permit if the current sewerage system is inadequate to serve the proposed development. EN § 9-512; Wincamp P'ship v. Anne Arundel County,458 F.Supp. 1009, 1012 (D.Md. 1978).
 IV Analysis
A. Vacant Lots Interspersed with Developed Properties
You initially asked whether the County is obligated to provide sewerage service to vacant lots interspersed among developed properties that will be served by the proposed sewerage system. We assume for purposes of this question that the vacant lots are located within the same service area as the developed properties. Under EN § 9-661(a), the sanitary commission is obligated to provide, at its own expense, "a connector to the property line of each parcel that abuts the way in which the sewer is laid."
Eligibility for a sewer connector, however, does not necessarily mean a right to sewerage service. As explained in Part III of this opinion, lack of treatment facility capacity or similar utility-related reasons might result in a moratorium or other restrictions on new connections. Furthermore, the Secretary of the Environment might limit connections to a sewerage system under the Department's broad authority to safeguard against water pollution. However, absent lawful restrictions, the owner of a vacant lot within a service area would be eligible for service when the property is developed.[12]
B. Vacant Lots Fronting Road Where Sewer Line Is Not Contemplated
In your second scenario, vacant lots front a street where there is no need to lay a sewer line to serve properties with failing septic systems. We assume that the collection system could be efficiently designed to bypass the vacant street. The exclusion of those properties would thus not render the design of the collection system infeasible from either a financial or engineering perspective. You asked whether the sanitary commission could refrain from running a sewer line down that street.
The answer to your question depends on how the sanitary commission defines the service area. Given the minimal statutory criteria for defining service areas, there is no prohibition on defining a service area to exclude an isolated area within its boundaries. Although the affected property owners could petition for the extension of the service area to include their properties, see EN § 9-649, in our view, the sanitary commission could reasonably exclude from the service area those streets where there is no immediate need.
C. Service Through Alternative Technologies
In your third scenario, vacant lots are interspersed with occupied lots along a road in which the sewer line will be laid. The vacant lots are unbuildable under current septic system regulations, but might be developed without sewerage service if the lots were combined or if alternative technologies were used. You ask whether these lots may be excluded from service.
Your question appears to assume that a sanitary commission could deny sewerage service to vacant lots, while servicing neighboring developed properties if individual septic systems could be used on the vacant lots. However, State law contemplates that, when a sanitary commission completes construction of a public sewerage system, abutting properties in the service area will rely on that system in lieu of individual septic systems. EN § 9-661(c); see also COMAR 26.03.01.05. This assumes, of course, that other factors do not preclude connection.
Thus, consistent with our answer to your first question, the County would be required to provide a connector for a vacant lot within a service area, even if an alternative technology were available or a combination of that lot with another would make an individual septic system technically feasible, and the property owner would be expected to connect to the system. However, if service were unavailable through the public sewerage system, an individual septic system might be constructed by combining lots[13] or alternative technology for sewage disposal might be employed, either as an interim or long-term alternative, in a manner permissible under the Department of Environment's regulations. See COMAR 26.03.01.05
and 26.04.02.06.[14]
D. Agricultural and Undeveloped Areas Outside Service Area
Your final scenario concerns farm and woodland properties that front sewer lines necessary to transport sewerage from a designated service area to a treatment plant. In our view, connections do not have to be provided to these properties if they are outside the designated service area. Read in isolation, EN § 9-661(a)(1) might be interpreted to require a connector for any property abutting any sewer line. However, a principal tenet of statutory construction is that, when part of a general statutory scheme, the sections of a statute must be read together to ascertain the true intention of the Legislature. Eng'g Mgmt. Serv. v. Maryland State Highway Admin., 375 Md. 211, 224-25, 825 A.2d 966 (2003). A sanitary commission's discretion to define service areas would be severely undermined if it were required to provide sewerage service to every intermediate property between a treatment facility and a defined service area. Thus, in our opinion, the obligation under EN § 9-661(a)(1) to serve abutting properties does not extend to interceptor lines outside a service area. Because the properties you describe would be outside the defined service area, sewerage connections would not have to be provided.
 V Conclusion
It is our opinion that:
1. The County will be required to provide a connector for each vacant lot within a service area that is interspersed among developed lots along a right-of-way in which a sewer line is laid. Nonetheless, sewerage service may not necessarily be available for every such lot. For example, the County might impose a moratorium or other restrictions on service for new development because of utility-related reasons such as insufficient treatment plant capacity or the Secretary of the Environment might impose restrictions on new connections for the protection of waters of the State. Absent such restrictions, however, the owner of the vacant lot would be eligible for sewerage service.
2. The County is not necessarily obligated to provide service to a street with vacant lots. Under State law, a sanitary commission may determine the extent of sewerage services by defining its service area. If there is no current need for a sewer line along a street and it would be feasible to design a system without laying a line along that street, the street could be excluded from the defined service area.
3. Consistent with our answer to the first question, the County would be required to provide a connector for each vacant lot within a defined service area, even if an alternative sewage disposal technology were available or a combination of that lot with another would make a septic system technically feasible. Under State law, a lot owner may not use a traditional septic system or an alternative technology for sewage service within a sanitary district if a public sewerage system is available. Thus, if vacant lots interspersed among developed lots are within the service area, neither traditional septic systems nor alternative technologies may be used. On the other hand, if public sewerage service is unavailable due to other factors, the lot owner may be able to combine lots in a manner that would allow construction of an individual septic system or employ alternative technology for sewage disposal.
4. A sanitary commission is not required to provide sewerage service outside defined service areas. The placement of an interceptor line necessary to connect a service area to a treatment facility does not make properties outside the service area that abut that line eligible for sewerage service. Thus, the County would not be required to provide service to the woodlands and farms mentioned in your question.
J. Joseph Curran, Jr. Attorney General
William R. Varga Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] The subdivisions and the anticipated phase in which sewerage service would be extended are as follows: Kent Island Estates and Romancoke (Phase 1); Kentmorr and Queen Anne's Colony (Phase 2); Batt's Neck (Normans), Chesapeake Estates, Matapeake Estates, and Sunny Isle of Kent (Phase 3); Dominion and Marling Farms (Phase 4); and Tower Gardens (Phase 5).
[2] Your letter also addressed provisions of the County ordinance governing the County's Sanitary District, Chapter 24 of the Public Local Laws of Queen Anne's County ("PLL"). In accordance with our usual practice, we defer to your County Attorney on questions of local law.
[3] In accordance with our policy governing requests for opinions from local governments, you included with your request a legal memorandum prepared on your behalf by Patrick M. Shelley, Esquire, McGuire Woods, LLP, which addressed both State and County law.
[4] Priority funding areas are designated by statute or by a county applying statutory criteria. SFP §§ 5-7B-02, 5-7B-03.
[5] The State programs subject to the funding limitations of the Smart Growth Law are set forth in the definition of "growth-related project." See SFP § 5-7B-01(d).
The Board of Public Works may waive the restrictions of the Smart Growth Law if it finds that there are extraordinary circumstances, based on criteria set forth in the statute. SFP § 5-7B-05. In addition, a State agency may approve funding for a project outside a priority funding area under certain circumstances without the need for Board of Public Works approval, e.g., where the project is required to protect the public health or safety or where federal funds are involved and compliance with the Smart Growth statute would be inconsistent with federal law. SFP § 5-7B-06. None of these factors appears to apply to extending service to undeveloped properties.
[6] Agricultural property may not be assessed until a connection is made to the property. The total assessment is then limited to a maximum of 300 feet of frontage. EN § 9-657(e).
[7] Of course, for a special benefit assessment to be valid, the property assessed must receive a special benefit from the public improvement. Beauchamp v. Somerset County Sanitary Comm'n,243 Md. 98, 102, 220 A.2d 135 (1966). The benefit to unimproved properties presumably is the eligibility to use the sewer line at some future time when the property is improved.
[8] While a sanitary district operates as a public utility, its operations generally are not subject to regulation by the Public Service Commission. See, e.g., Annotated Code of Maryland, Public Utility Companies Article ("PUC"), § 5-204 (PSC's authority over sewerage system construction does not extend to sanitary commissions).
[9] The Sanitary Commission of Worcester County may initially forgo providing a connector to a property that lacks a plumbing system at the time of construction of the system. EN § 9-661(a)(2).
[10] While a sanitary district has broad discretion to define service areas within the county, or in the case of a multi-county district, within the counties, that discretion is not unlimited. A sanitary district may not compel a municipality to forfeit its rights in operating an existing municipal system. EN § 9-643. See Garrett County Sanitary Dist. v. Mayor Town Council of Oakland, 249 Md. 400, 405, 240 A.2d 228
(1968).
[11] A moratorium is by definition a temporary restriction. Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n, 400 F. Supp. 1369,1383 (D. Md. 1975). While sewer hook-ups may be delayed for utility-related reasons, a sanitary commission is expected to make provision in planning any expansion for reasonable and natural growth. 11 McQuillin, The Law of Municipal Corporations § 31.17 (3rd ed. rev. 2000). In planning system development, a county must also take into account development considerations reflected in its comprehensive plan. EN §§ 9-505(a)(1), 9-511; see also COMAR 26.03.01.02A ("The objective of the county [water and sewerage] plan is to develop the water and sewerage systems in a way consistent with county comprehensive planning").
[12] Of course, other laws may affect the ability to develop a particular lot, including laws unrelated to the availability of sewerage service. For example, a local adequate facility ordinance might affect whether or not a particular property may be developed at a particular time, notwithstanding the availability of sewerage service.
[13] Under the Department of Environment's regulations, authorization for individual septic systems is based on the property's status under the County's water and sewer plan. Therefore, authorization for this construction based on unavailability of access to the public sewerage system would need to be reflected in the plan. Of course, the plan would be subject to the Department's approval. EN § 9-507.
[14] The General Assembly has established a grant program under which counties may qualify for funding for innovative and alternative septic systems for certain properties. See EN § 9-1401 et seq. However, this program has not been funded during the past several years. *Page 74