910 A.2d 1100

**Eugenia M. NEIFERT, et al.**

v.

**DEPARTMENT OF THE ENVIRONMENT, et al.**

**No. 10, Sept. Term, 2006.**

Court of Appeals of Maryland.

Nov. 14, 2006.

Raymond S. Smethurst, Jr. (Matthew T. Mills, Adkins, Potts & Smethurst, LLP, Salisbury) on brief, for Appellants.

Adam D. Snyder, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General, Matthew Zimmerman, Asst. Atty. General, Baltimore) on brief, for Appellees.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, Judge.

Eugenia M. Neifert, Melvin D. Krolczyk, and Teresa A. Krolczyk, appellants, own four lots in the Cape Isle of Wight subdivision in Worcester County. Appellants have been denied sewer service and wetland fill permits and therefore are unable to develop their lots. We must decide whether the Maryland Department of the Environment violated appellants' equal protection rights by denying sewer service and whether the denial of sewer and wetland fill permits constitutes an unconstitutional taking. We shall hold that the denial of sewer service under the 1992 Policy satisfies rational basis review under equal protection analysis and that appellants did not suffer an unconstitutional taking.

I.

Appellants own four contiguous lots within the Cape Isle of Wight subdivision in Worcester County. Eugenia M. Neifert owns in fee simple lots 9, 10, and 11 and Melvin D. Krolczyk and Teresa A. Krolczyk own in fee simple Lot 8. Eugenia Neifert acquired her lots by gift from her mother in 1975; her parents acquired title to the lots in 1962. The Krolczyks purchased their lot in 1974. The deed to each lot contains a restriction requiring that any "[s]eptic tanks, sewage disposal

systems and drinking water facilities shall conform to all requirements established by the Maryland State Department of Health and the Worcester County Maryland Health authorities." Each of appellants' lots also abut Marlowe Road, a dedicated but unimproved 40–foot wide street.

The Cape Isle of Wight subdivision was established in the early 1950's and is comprised of land created by excavating canals in a tidal marsh and sidecasting the excavated material on both sides to cover the marsh and create uplands. Cape Isle of Wight contains 625 lots and, as of 1972, approximately 128 homes existed in the subdivision. Each of these homes used a septic system that was approved based on percolation tests that could be completed at any time throughout the year.[1]

In the mid–1970's, a sewage disposal problem developed in the West Ocean City area of Worcester County, Maryland.[2] *See Department of Environment v. Showell,* 316 Md. 259, 558 A.2d 391 (1989). Approximately half of the septic systems actively used in the area failed.[3] *Id.* at 260, 558 A.2d at 391. Untreated sewage leaked into drinking water supplies and created a public health hazard. *Id.* Worcester County responded to the situation by requiring that lots pass a seasonal percolation test conducted during January through April, the wettest months of the year and when the water table was at

---

**1.** A percolation test is used to determine if the soil will absorb and drain water adequately enough to install and use a domestic sewage-disposal system. The testing procedure, generally speaking, involves digging several holes, filling them with water, and measuring the rate at which the water-level decreases.

**2.** Several cases have discussed the septic system failures in West Ocean City. *See Shanty Town Assocs. Ltd. P'ship v. EPA,* 843 F.2d 782 (4th Cir.1988); *Department of Environment v. Showell,* 316 Md. 259, 558 A.2d 391 (1989); *Shanty Town Assocs. Ltd. P'ship v. Dep't of Env't,* 92 Md.App. 103, 607 A.2d 66 (1992).

**3.** The difficulties presented by a high groundwater table and poorly drained soils were exacerbated by the fact that more people were residing in the area year-round as opposed to just the summer months.

its highest.[4] As a result, eighty to ninety percent of new applications for septic permits in West Ocean City were denied. *Id.* In the Cape Isle of Wight subdivision, approximately 150 lot owners requested septic tank permits from 1976–1979 and 148 of those requests were denied because the lots were unable to pass the seasonal percolation testing. Appellants' lots were among those denied on-site septic system permits in 1979 and they did not appeal this decision.[5]

A central sewage collection system was proposed for the West Ocean City area to allow for the development of new homes and businesses. Each of appellants' four lots are located in the sewer system district. The considerable expense associated with the project required the County to seek additional funding from the State of Maryland and the U.S. Environmental Protection Agency (EPA). EPA's 1983 Final Environmental Impact Statement (EIS) concluded that EPA could only provide a construction grant if certain restrictions were met. EPA's funds were conditioned on the system not providing sewer service to any parcel of land within any wetlands, as defined by the U.S. Fish and Wildlife Service, or to any parcel of land within the 100 year floodplain if it was platted as a building lot after May 31, 1977.[6] EPA also

---

**4.** Seasonal testing was required under Regulation 10.03.27, Governing the Installation of Private Water Supply and Sewage Disposal Systems and Directive Policy GS–6 ("GS–6 Policy").

**5.** The Worcester County Department of Public Health informed Melvin Krolczyk on June 12, 1979 that Lot 8 was not buildable under Regulation 10.03.27, Governing the Installation of Private Water Supply and Sewage Disposal Systems and Directive Policy GS–6. The Worcester County Department of Public Health informed Eugenia Neifert on October 25, 1979 that Lots 9, 10 and 11 were not buildable under the GS–6 Policy.

**6.** Executive Orders require federal agencies to evaluate the effects of their actions on floodplains and wetlands. Exec. Order No. 11,990, 42 Fed.Reg. 26,961 (May 24, 1977); Exec. Order No. 11,988, 42 Fed.Reg. 26,951 (May 24, 1977). The Environmental Protection Agency is required to comply with these Executive Orders. 40 C.F.R. § 6.302 (2006).

Appellants' lots are located in the 100–year floodplain and were platted prior to 1977 so their lots are not precluded from eligibility for sewer service based on the floodplain restriction set forth by EPA.

required the Worcester County Sanitary Commission ("Sanitary Commission") to submit maps that clearly delineated all non-service areas. The Maryland Department of Health and Mental Hygiene (DHMH) and the Sanitary Commission formalized their commitment to these restrictions in a Consent Order on June 28, 1983.[7] The total sewer system cost was funded by the EPA (75%), the State of Maryland (12.5%), and Worcester County (12.5%).

The Worcester County Sanitary Commission hired the engineering firm of George, Miles & Buhr to create a set of maps ("1984 Maps") identifying non-service areas, *i.e.* those parcels that fell within wetlands as defined by the Fish and Wildlife Service or were located in the 100–year floodplain and were platted after 1977. The 1983 EIS maps were not relied upon because lot lines were not visible. Instead, George, Miles & Buhr created the 1984 Maps by enlarging National Wetland Inventory maps developed by the Fish and Wildlife Service from large-scale aerial photography and superimposing them onto a map of the sewer service area. The 1984 Maps provided approximate wetland delineations and were used as general guidance in granting sewer service.[8]

According to the 1984 Maps, lots 8, 9, and 10 and much of the portions of Marlowe Road adjacent to the lots contained wetlands.[9] Appellants applied to Dr. Donald Harting, the Health Officer of Worcester County, for sewer connections in 1985 and their request was denied.[10] Dr. Harting's September

---

7. The regulatory functions and responsibilities of the Department of Health and Mental Hygiene related to this case eventually were transferred to the Department of Environment. *See* 1987 Md. Laws, Chap. 306 (establishing the Department of Environment).

8. Wetland delineations outline the borders around wetland areas.

9. Lots 8 and 10 had small portions of wetlands, lot 9 was approximately 20–25% wetlands, and lot 11 was entirely upland. Almost all of Marlowe Road adjacent to lots 8, 9, and 10 was within wetlands.

10. The Consent Order established a permit system for obtaining sewer service where lot owners applied to the Worcester County Health Officer for a permit. Lot owners could then appeal to the Director of

10, 1985 letter denied sewer system access because "the southerly portion of Marlowe Road and lots 8, 9, 10, and 11 were classified as wetlands ... [A]ll lots which are classified as wetlands are prohibited from connecting to the sewerage system."

Appellants requested a review of Dr. Harting's decision by Richard B. Sellars, Jr., Director of the Water Management Administration at DHMH. Director Sellars affirmed Dr. Harting's decision to deny service because the Consent Order prohibited service for any lots within wetlands as defined by the Fish and Wildlife Service. Appellants appealed to the DHMH's Office of Hearings. On December 23, 1986, Arthur E. Cohen, a DHMH hearing examiner, affirmed Dr. Harting's decision to deny sewer service to Lots 9 and 10, but reversed the decision with regard to Lots 8 and 11. The Final Decision Maker, Timmerman T. Daugherty, issued a Final Decision and Order on July 16, 1990 affirming Dr. Harting's denial of sewer service to all of appellants' lots.[11]

Appellants sought judicial review in the Circuit Court for Worcester County. On July 16, 1991, the Circuit Court held that it was not error to base a wetland determination upon additional evidence which conflicts with the 1984 Maps as the maps were not binding and held that Dr. Harting's decision to deny sewer service to appellants was not supported by substantial evidence. The Circuit Court remanded the case for the County to re-consider whether appellants' lots qualified as wetlands. Appellants held the sewer service appeal in abeyance while they pursued wetland permits and did not readdress the sewer service proceedings until 1998.

By 1986, the Sanitary Commission was concerned that the 1984 Maps did not accurately show nontidal wetlands. At a

---

the Water Management Administration of the Department of Health and obtain further review pursuant to the Maryland Administrative Procedure Act.

**11.** The Final Decision Maker of the Secretary of the Department of the Environment, as opposed to the DHMH, determined this case. *See supra* note 7.

meeting on February 7, 1986, representatives from the Worcester County Sanitary District, the Department of Natural Resources and the U.S. Army Corps of Engineers ("Corps of Engineers") met to identify lots, not then mapped as wetlands, that needed on-site investigations to determine accurate wetland delineations for a set of revised maps ("1986 Maps").[12] Appellants' lots were included in the list for on-site investigation. Appellants' lots had also been inspected in April of 1985 by individuals from the Corps of Engineers, the Department of Natural Resources, and the Worcester County Health Department.[13] As a result of these visits and investigations, appellants' lots on the 1986 Maps were reclassified as containing 60–100% mapped wetlands.[14] The County continued to use the 1986 Maps as guidance, but sewer service was denied to any property mapped as a wetland or any property defined as a wetland under the applicable Fish and Wildlife Service delineation. Thus, up until 1992, any property within wetlands was denied sewer service, whether mapped or not.[15]

---

**12.** Formally, the 1986 Maps are labeled as the 1984 Maps with amended revisions.

**13.** This investigation was initiated by the owner of lot 7 in order to determine his eligibility for sewer service. While evaluating the lot 7 property, it was determined by the experts from the Corps of Engineers, the Department of Natural Resources, and the Worcester County Health Department that the southerly portion of Marlowe Road and lots 8, 9, 10, and 11 were wetlands. An on-site visit was completed by the same agencies on September 26, 1985. Additionally, on July 14, 1986, Robert Zepp of the U.S. Fish and Wildlife Service made a site visit of appellants' properties.

**14.** Lot 8 is depicted as 90% wetlands, lot 9 is 100% wetlands, lot 10 is approximately 75% wetlands, and lot 11 is approximately 60% wetlands. All of Marlowe Road adjacent to lots 8, 9, 10, and 11 is designated as wetlands.

**15.** Specifically, between 1984 and 1992, sewer service was denied to (1) lots that contained mapped wetlands, as field-verified, and (2) lots that were not mapped as wetlands but that turned out to contain wetlands after a wetland delineation. However, the County would grant sewer service to a lot partially within wetlands if the owner could demonstrate that the lot satisfied the structures test, meaning that all buildings and ancillary structures would be constructed within the upland portions of the lots.

In 1991, the Maryland Department of the Environment ("Department") became aware that many lot owners who had invested in the purchase of lots in reliance on the wetland guidance maps felt that their investment-backed expectations were frustrated by the application of new wetland delineation methodologies.[16] As a result, the Department requested that EPA reconsider the Consent Order's prohibition of sewer service for lots within wetlands in light of the recent implementation of the Corps of Engineers' "Federal Manual for Identifying and Delineating Jurisdictional Wetlands" ("1989 Federal Manual"). Interior lots were classified as wetlands even though they were identified on the guidance maps as entirely non-wetland as a result of the application of the 1989 Federal Manual in West Ocean City.[17] In response, the Department, after consulting with the Worcester County Sanitary Commission, proposed a change in how the Consent Order would be implemented. The Department wrote EPA on November 20, 1991, seeking its concurrence with the

---

**16.** Worcester County and Maryland Department of Environment were prompted to propose a change to the interpretation of the Consent Order when an entire block of interior lots in Section C of the Cape Isle of Wight subdivision, which had been issued building permits and were not close to the wetland line on the guidance maps, were defined as wetlands under the Corps of Engineers' "Federal Manual for Identifying and Delineating Jurisdictional Wetlands" and, as a result, denied sewer service.

**17.** The presence of non-mapped wetlands was always grounds for sewer service denial, but use of the 1989 Federal Manual by the Corps of Engineers resulted in identification of more wetlands during the building construction permit process. Prior to 1989, the definition of wetlands used by the Corps of Engineers required a positive wetland indicator be present for *each* parameter (vegetation, soils and hydrology) while the Fish and Wildlife Service required only a positive indicator for *any* one of the three parameters. *See* U.S. ARMY CORPS OF ENGINEERS ENVIRONMENTAL LABORATORY, CORPS OF ENGINEERS WETLANDS DELINEATION MANUAL, Technical Report Y–87–1, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS (1987). As the Corps of Engineers was more likely to identify wetlands under the 1989 Federal Manual, sewer service to the building would be denied because the structure was located in a wetland, regardless of how that wetland was defined and even if the lot owner had secured a construction permit under the 1989 Federal Manual.

proposed policy change. In its letter, the Department summarized the difficulties the 1989 Federal Manual had caused as follows:

"Cases have arisen of late where lot owners relied on the maps of record and determined that sewer service was available. They then arranged financing, only to find that they were precluded from proceeding with construction due to the discovery of wetlands on the property. The discovery would come as a result of the later use of a more stringent definition of the term wetlands. At that point the lot owner would attempt to work with the proper wetlands regulatory authorities to gain approval to construct the proposed building. The problem is, however, that if the lot owner was successful in securing a permit from the Corps of Engineers to construct a building, sewer service to that building would be denied under the premise that service to a structure in a wetland, no matter how or when that wetland came to be defined, is prohibited under the terms of the Consent Order."

While field verifications of the guidance maps in 1985 and 1986 adjusted the wetland boundaries of lots already reflected on the 1984 maps as containing wetlands, implementation of the 1989 Federal Manual resulted in large blocks of interior lots—those not close to mapped wetland lines—being defined as wetlands. The Department realized that individuals who had purchased lots in reliance on the maps found that they were no longer able to build on their lots because, based on the delineation methods in the 1989 Federal Manual, their lots were now categorized as wetlands.

As more lots became ineligible for sewer service, the Department also became concerned about the County's ability to retire the debt it had assumed in order to finance its share of the project. The Department proposed what it believed to be a "reasonable solution" to the problem that would not "contraven[e] the purpose or intent of the consent order or grant

condition." [18]    The Department explained as follows:

"Our proposal is to allow the wetlands delineation proce-
dures that existed at the time of the signing of the Consent
Order to be utilized for the purpose of determining a lot's
ability to receive sewer service.    If post-Consent Order
wetland delineations are conducted using current delinea-
tion procedures, which presumably result in a larger ex-
panse of land defined as wetlands, then the matter falls
outside of the scope of the Consent Order.    Resolution of
the matter would lie between the lot owner and the Corps of
Engineers.    If the final outcome is the issuance of a wet-
lands construction permit and construction does not infringe
upon the wetland areas defined under the procedures that
existed as of 1983, then sewer service would be allowed."

In 1992, EPA responded to the Department by expressing its
adoption of the Department's proposal in two separate letters,
one to the Corps of Engineers and one to the Department.
EPA stated in its letter to the Corps of Engineers as follows:

"Specifically, we have interpreted the implication of wetland
delineation methodology changes since 1983 and the impact
of these changes on sewer hook up eligibility . . .

"[W]e interpret the restrictions of the 1983 EIS to apply to
only those wetland areas originally identified in the 1983
EIS.    Those areas outside of the 1983 delineation but within
current jurisdictional wetland boundaries will be eligible for
hook up provided they receive a Section 404 permit, a 401
Water Quality Certification, a State Non–Tidal Wetlands
permit or other authorization and all other required State
and local permits."

Under this 1992 Policy, parcels lacking mapped wetlands on
the 1986 maps were granted sewer service if they obtained all

---

18.    Under 40 C.F.R. § 35.965, EPA's Regional Administrator may im-
pose sanctions if the Administrator determines that a grantee has not
complied with the terms of a grant for construction of a sewer system.
Sanctions authorized by 40 C.F.R. § 35.965 include termination of the
grant, suspension of work, or a determination that the grantee is
ineligible for future Federal assistance.

necessary wetland fill permits.[19]    At least 26 lots have obtained the proper fill permits and were granted sewer service under the 1992 Policy;   each of these lots contained "unmapped" wetlands ("List of 26").[20]    Conversely, lots with mapped wetlands were ineligible for sewer service according to the 1992 Policy unless all buildings and ancillary structures could be located on uplands, *i.e.* meet the structures test.   No sewer service has been granted to a mapped wetland lot. Appellants' lots contain mapped wetlands under the delineation methodology in place as of 1983.[21]

In 1992, appellants filed a joint application with the Department of Natural Resources to fill the nontidal wetlands delineated on their four lots and the adjacent Marlowe Road.[22] The Department of Natural Resources denied appellants' applications in February 1993, finding that the economic benefits did not outweigh the ecological costs and that appellants had not demonstrated that the project was necessary to meet a demonstrated public need.[23]

---

**19.**  The 1983 delineation referred to in the EPA policy letter dated March 24, 1992 refers to all wetland guidance maps that were developed in response to the Consent Order, *i.e.* the 1983, 1984 and 1996 Maps.

**20.**  The actual number of lots may be as low as 25 because of a duplicate lot listing or more than 50, according to the testimony of Richard L. Wells, Director of Environmental Programs.  We use "List of 26" because this is the number of lots listed in an exhibit as non-mapped lots that are, on the ground, actual in fact wetlands and received sewer service under the 1992 Policy.  The Circuit Court utilized the number 25 because it was thought that one lot was listed in duplicate on the List of 26.

**21.**  Lots 8, 9, and 10 and Marlowe Road contained mapped wetlands on the 1984 Maps. Lots 8, 9, 10, and 11 and Marlowe Road contained mapped wetlands on the 1986 Maps.

**22.**  As of July 1, 1995, the regulatory functions and responsibilities of The Department of Natural Resources's Water Resources Administration were transferred to the Maryland Department of the Environment's Water Management Administration.  1995 Md. Laws, Chap. 488.

**23.**  During these proceedings, the Nontidal Wetlands Protection Act was moved from the Natural Resources Article to the Environment Article

Appellants sought administrative and judicial review. Appellants filed for a contested case hearing with the independent Maryland Office of Administrative Hearings. Administrative Law Judge Joan C. Ross held a hearing and issued a Recommended Decision on August 15, 1994 that affirmed the Department of Natural Resources's denial of the permit application. On April 21, 1995, Robert D. Miller, the Director of the Department of Natural Resources's Water Resources Administration, filed a Final Decision and Order also affirming the denial. Appellants sought judicial review in the Circuit Court for Worcester County. In April 1997, the Circuit Court for Worcester County held that the denial of a fill permit was not supported by substantial evidence and was arbitrary, capricious and erroneous as a matter of law because the Department of Natural Resources had not properly evaluated the economic and ecological value of the nontidal wetlands. The Court remanded the case to the Department of the Environment for a new hearing.

In August 1997, appellants filed additional wetland permits with the Department of the Environment. Following a public hearing on the permit applications, the Department denied this second request for permits on October 13, 1998 because of the high value of the wetland functions and the lack of a demonstrated public need for their proposed project. Appellants filed for a contested case hearing with the Office of Administrative Hearings. Administrative Law Judge Geraldine A. Klauber filed a Recommended Order on January 6, 2000 affirming the Department's denial of the permit because the record reflected that the Department performed its statutory duty in reviewing the wetland fill permit applications. The Department's Final Decision Maker, A. Katherine Hart, filed a Final Decision and Order on May 9, 2001 affirming the

---

in the Maryland Code. Regulations on the subject of nontidal wetlands were moved from COMAR Article 8 to COMAR Article 26. The Department of Natural Resources was required to evaluate the economic and ecological value of nontidal wetlands under COMAR 08.05.04.05(D)(2)(d), currently COMAR 26.23.02.04(D)(2)(d).

decision to deny appellants' fill permits. Appellants did not seek judicial review.

In 1998, appellants reinitiated their application for sewer service under the 1992 Policy. Richard L. Wells, the Worcester County Environmental Programs Administrator, denied sewer service to appellants in November 1998. Appellants filed for a contested case hearing. At the hearing, appellants argued that the Department was interpreting EPA's 1992 Policy improperly and arbitrarily and that the Department's interpretation denied them due process. Administrative Law Judge Louis N. Hurwitz concluded that the Department did not act in an arbitrary and capricious manner in applying the 1992 Policy to appellants' lots and affirmed the denial of service on February 10, 2000. The Department's Final Decision Maker, A. Katherine Hart, affirmed the denial of sewer service on November 16, 2001. Appellants did not seek judicial review.

Appellants filed the present suit in the Circuit Court of Worcester County on April 3, 2003. Appellants sought damages and attorneys fees from the Department and, pursuant to 42 U.S.C. § 1983, from the officials responsible for the permit denials claiming the denial of equal protection and an unconstitutional taking under both the United States and Maryland Constitutions. The parties filed cross-motions for summary judgment and the Department filed a motion *in limine*, arguing that appellants were precluded from re-litigating the issue of whether their four lots were similarly situated with other wetland lots that had obtained sewer service under the 1992 Policy because they had litigated the same issue in the earlier contested case hearing. The Circuit Court held a hearing on the motions on April 18, 2005 and granted summary judgment in the Department's favor on all counts, ruling that the denial of wetland fill permits and sewer hookups did not constitute a taking or violate appellants' equal protection rights.

Appellants noted a timely appeal to the Court of Special Appeals. We granted certiorari on our own initiative prior to

decision by that court. *Neifert v. Department of Environment,* 393 Md. 160, 900 A.2d 206 (2006).

## II.

Before this court, appellants argue that the Department's denial of sewer service under the 1992 Policy denies them equal protection of the law under the Equal Protection Clause of the United States Constitution and Article 24 of the Maryland Declaration of Rights because there is no rational basis for providing service to non-mapped wetlands lots and denying service to mapped wetlands lots.[24]  Appellants assert also that the denial of sewer service and wetland fill permits has rendered their lots undevelopable and constitutes an unconstitutional taking of property without just compensation under the Fifth Amendment of the U.S. Constitution and Article III, § 40 of the Maryland Constitution.

The Department of the Environment responds that appellants' equal protection claim fails because their mapped wetland lots are not similarly situated to the non-mapped wetland lots that were provided sewer service, an issue appellants are collaterally estopped from contesting, and that the 1992 Policy is rationally related to the Department's concerns about fairness, fiscal integrity, and ecological soundness.  The Department asserts that appellants' lots were undevelopable as of 1979 and that appellants have no constitutionally protected right to sewer access.  Consequently, the Department contends, there was no unconstitutional taking associated with the denial of sewer service.

## III.

The standards for review of a trial court's grant of summary judgment are well-established.  We review *de novo* the Circuit Court's grant of summary judgment. *Livesay v.*

---

**24.** All of the lots are contained on a recorded plat.  The use of non-mapped and mapped lots refers to whether a lot was delineated as wetlands on a map of a particular agency as of a relevant time.

*Baltimore,* 384 Md. 1, 9, 862 A.2d 33, 38 (2004). In reviewing a grant of summary judgment, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Id.* at 9–10, 862 A.2d at 38. We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Id.* at 10, 862 A.2d at 38. In the present case, both parties filed motions for summary judgment, there is no dispute of material fact, and the only questions before us relate to the application of equal protection and takings law.

## IV.

We address first whether the Department of the Environment violated appellants' equal protection rights by denying sewer service under the 1992 Policy. Appellants contend that the 1992 Policy, as applied, violates the Equal Protection Clause of the United States Constitution and Article 24 of the Maryland Declaration of Rights.

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws," and directs that all persons similarly situated be treated alike. *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Article 24 of the Maryland Declaration of Rights states "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Although Article 24 does not contain an express equal protection clause, this Court has held that the concept of equal protection is embodied within the Article. *Frankel v. Bd. of Regents,* 361 Md. 298, 312–13, 761 A.2d 324, 332 (2000) (quoting *Renko v. McLean,* 346 Md. 464, 482, 697 A.2d 468, 477 (1997)). United States Supreme Court cases applying the Equal Protection Clause of the Fourteenth Amendment are binding on this Court when

applying that clause and are persuasive when applying Article 24 of the Declaration of Rights. *Id.*

Appellants are not members of a suspect class and a fundamental right is not at issue; therefore, our standard of review is the traditional and deferential rational basis analysis. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (reiterating that any classification by race, alienage, or national origin is suspect and must be evaluated under a strict scrutiny standard); *Broadwater v. State*, 306 Md. 597, 603, 510 A.2d 583, 586 (1986) (stating that general rule of sustaining a statutory classification if it is rationally related to a legitimate state interest gives way when a statute classifies by race, alienage or national origin (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313)); *see Attorney General of Maryland v. Waldron*, 289 Md. 683, 706, 426 A.2d 929, 942 (1981) (documenting fundamental rights or interests guaranteed by the federal constitution). Under rational basis review, a legislative classification is sustained if the classification is rationally related to a legitimate state interest.[25] *See City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *Ehrlich v. Perez ex rel. Perez*, 394 Md. 691, 715, 908 A.2d 1220, 1234 (2006). There is a strong presumption of constitutional validity when social or economic legislation is at issue. *See City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *Lamers Dairy, Inc. v. U.S. Dept. of Agric.*, 379 F.3d 466, 473 (7th Cir.2004) (applying deference to agency established classi-

---

**25.** The majority of rational basis cases have involved judicial review of legislative decisions, but the same basic standard of review applies to judicial review of administrative decisions. *Nordlinger v. Hahn*, 505 U.S. 1, 15–16 & n. 8, 112 S.Ct. 2326, 2334–35 & n. 8, 120 L.Ed.2d 1 (1992) (explaining that rational basis review applies to administrative decisions and that the standard of review is no different from the one applied to legislative classifications); *Sunday Lake Iron Co. v. Wakefield Tp.*, 247 U.S. 350, 352, 38 S.Ct. 495, 495, 62 L.Ed. 1154 (1918) ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.").

fication); *Piscatelli v. Board of Liquor License Comm'rs*, 378 Md. 623, 643, 837 A.2d 931, 943 (2003). In reviewing legislation, we have stated as follows:

> "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification ........ This standard of review is a paradigm of judicial restraint."

*Maryland Aggregates Ass'n v. State*, 337 Md. 658, 673, 655 A.2d 886, 893 (1995) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993)).

The rational basis test requires appellants to prove that (1) the government treated them differently than it treated others similarly situated, and (2) the disparate treatment did not bear a rational relationship to a legitimate interest. *Lawrence v. Texas*, 539 U.S. 558, 579, 123 S.Ct. 2472, 2484, 156 L.Ed.2d 508 (2003) (O'Connor, J., concurring) (noting that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike" (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985))); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000); *Broadwater*, 306 Md. at 602, 510 A.2d at 585 (1986) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)).

## V.

We turn to appellees' argument that appellants are collaterally estopped from re-litigating the finding in the earlier contested case that their lots are similarly situated to the non-mapped wetlands lots in the West Ocean City area that

obtained sewer service. The Circuit Court held that appellants are not collaterally estopped from arguing that their lots are similarly situated. We agree.

An administrative agency's decision is given preclusive effect based on three factors: (1) whether the agency was acting in a quasi-judicial capacity, (2) whether the issue presented to the circuit court was actually litigated before the agency, and (3) whether resolution of the issue was necessary to the agency's decision. *Batson v. Shiflett,* 325 Md. 684, 701, 602 A.2d 1191, 1200 (1992). The Department's final decision maker acted in a quasi-judicial capacity when she issued a Final Decision and Order on November 16, 2001 that affirmed Administrative Law Judge (ALJ) Hurwitz's recommendation to deny sewer service to Lots 8, 9, 10, and 11. The similarly situated issue was addressed in each parties' briefs in connection with appellants' due process claim. Resolution of the issue, however, was not necessary to the agency's decision. The ALJ and the Department's final decision-maker could have denied appellants' due process claims without addressing the similarly situated issue because appellants were given full procedural due process and did not have a valid substantive due process claim. *La Chance v. Erickson,* 522 U.S. 262, 266, 118 S.Ct. 753, 756, 139 L.Ed.2d 695 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard."); *Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal,* 135 F.3d 275, 286–87 (4th Cir.1998) (affirming that access to government provided sewer service is not a constitutionally protected right under Virginia law); *Blue Cross v. Franklin Sq. Hosp.,* 277 Md. 93, 101, 352 A.2d 798, 804 (1976) ("Generally, due process requires that a party to a proceeding is entitled to both notice and an opportunity to be heard on the issues to be decided in a case.).

Moreover, our review of ALJ Hurwitz's Recommended Order on Remand indicates that the contested case focused primarily on whether lots 8, 9, 10, and 11 were *eligible* for sewer service and was not concerned with how the Department implemented the Consent Order for similarly situated

lots that received sewer service. Although the Department's
Final Decision Maker concluded that, "the lots were not
treated differently than similarly situated lots in the West
Ocean City area," it is not apparent from the record how this
decision was made. The Department's Final Decision Maker's
conclusion was based on the determination by ALJ Hurwitz
that the delineation procedures in place at the time of the
Consent Order were properly applied to lots 8, 9, 10, 11; ALJ
Hurwitz did not directly address whether the Department and
the County properly applied the appropriate wetlands delinea-
tion procedures under the Consent Order to similarly situated
lots. In fact, ALJ Hurwitz stated, "[e]ven if [the Department]
has implemented the Consent Order in an arbitrary and
capricious manner regarding other lots, its treatment of those
lots have no bearing upon the sewer service eligibility of
*Appellants'* lots." We hold that appellants are not collaterally
estopped from asserting that their lots are similarly situated
to the non-mapped wetlands lots that obtained sewer service
under the 1992 Policy.

## VI.

■ Appellants' properly raised the similarly situated issue
and we now determine it on the merits. We hold that
appellants' lots are not similarly situated to those lots that
have received sewer service under the 1992 Policy. Appel-
lants' lots contain mapped wetlands and are not similarly
situated to non-mapped wetland lots that received sewer con-
nections. In fact, appellants concede that their lots constitute
mapped wetlands; they concede also that the County has
applied the distinction consistently between mapped and non-
mapped wetland lots to determine sewer service eligibility
under the 1992 Policy. Lots 8, 9, and 10 contained a small
area of mapped wetlands on the 1984 Maps and on the 1986
Maps (the revised 1984 Maps) each lot was 60–100% mapped
wetlands. The List of 26 lots do not contain mapped wetlands
on either of the Consent Order maps. The 1992 Policy
distinguishes between mapped and non-mapped wetlands.
Based on this distinction, appellants' mapped lots are not
similarly situated to non-mapped lots on the List of 26.

## VII.

The distinction between mapped and non-mapped wetlands as used in the 1992 Policy bears a rational relationship to several legitimate state interests. The distinction is rationally related to the State's legitimate interest in addressing the unfairness created by changing definitions of wetlands and ensuring the fiscal integrity of the sewer system while adhering to the environmental restrictions set forth in the Consent Order conditioning EPA's grant. By conditioning sewer service eligibility on the wetland guidance maps and the wetland delineation methodologies in place as of 1983, the 1992 Policy addresses fairness concerns by restoring property owners' expectations; expectations that were established when they purchased lots in reliance on the maps and then eliminated when they were "caught up in the implementation of new wetland delineation methodologies." As the State argues, the restoration of property owners' expectations in turn addresses the Department's concerns about the solvency of the sewer system because the number of lots over which to spread the cost of the system is maintained. Furthermore, in applying the service prohibition of the Consent Order to all of the lots reflected on the EPA mandated wetland guidance maps, the 1992 Policy ensures that federal funding of the sewer system does not result in the destruction of wetlands that were known to exist at the time the Consent Order was effectuated.

The record reveals the Department's concern with fairness. The Department received letters from Jeff Mumford and Matt Engle in September 1991 appealing the Department's determination on a July 29, 1991 field visit that their formerly buildable lots in West Ocean City were wetlands. Mr. Engle asserts that he believed the lots were totally buildable when purchased in August of 1991. Mr. Mumford's letter indicates that he paid the annual front foot assessment on his lots since it was imposed.[26] The Department received an additional

---

26. A sewer system often charges an annual front foot assessment to repay the cost of construction.

letter in January 1992 from Lal Keswani's attorney. The letter stated that Mr. Keswani purchased his lot on November 21, 1989 after ensuring that it was eligible for sewer service under the Consent Order. Subsequently, Mr. Keswani was denied sewer service because of the identification of wetlands on his parcel. Each of these individuals relied upon the Consent Order maps to their detriment and their cases demonstrate that the Department had a rational basis for seeking EPA assistance to address the unfairness created by the changing definitions of wetlands.[27]

These letters demonstrate that the Department and County proposed the mapped/non-mapped distinction to address issues associated with the implementation of the Corps of Engineers' 1989 Federal Manual. Specifically, the Administrator of the Capital Projects Program at the Department, Angelo Bianca, wrote a letter to EPA on November 20, 1991 to address issues of fairness and adherence to environmental restrictions.[28] Mr. Bianca noted that use of the 1989 Federal Manual was "unfair to lot owners who rely on the maps to square away the issue of sewer service" and that "a reasonable solution" was "to allow the wetlands delineation procedures that existed at the time of the signing of the Consent Order to be utilized for the purpose of determining a lot's ability to receive sewer service."

The Department's fairness concern is supported also by the confusion and criticism associated with implementation of the 1989 Federal Manual. The 1989 Federal Manual provided a uniform method for wetland delineations by the EPA, the Corps of Engineers, the Soil Conservation Service, and the Fish and Wildlife Service, but it was criticized for increasing

---

27. Appellants assert that the maps were not recorded in any public office, but the Consent Order requires that the map showing boundaries of the wetlands identified by Fish and Wildlife Service and the 100–year foodplain "shall be available for public inspection." The letters from individuals also indicate that the maps were accessible to prospective property owners and other parties.

28. *See* facts *supra* Part I for full text of the letter.

the Corps of Engineers' scope of regulatory jurisdiction under the Clean Water Act beyond historical limits. *See* Michael C. Blumm, *The Clinton Wetlands Plan: No Net Gain In Wetlands Protection,* 9 J. Land Use & Envtl. L. 203, 208 (1994); Michael S. Nagy, *The Definition of "Wetlands" Under Section 404 of the Clean Water Act: Past, Present, and Future,* 3 U. Balt. J. Envtl. L. 92, 94–96 (1993) (noting companies', farmers', and builders' dislike of the Manual because it was too strict). In response to the criticism, the Corps of Engineers and EPA developed and published for public comment on August 14, 1991 proposed revisions to the 1989 Federal Manual.[29]  56 Fed.Reg. 40,446–01 (Aug. 14, 1991).  On August 17, 1991, federal legislation was enacted that precluded the Corps of Engineers from relying on the 1989 Federal Manual. *See* Energy and Water Development Appropriations Act of 1992, Pub.L. No. 102–104, 105 Stat. 510, 518 (1991).  As a result, the Corps of Engineers returned to using the 1987 Manual, though it was not until January 1993 that EPA abandoned its attempt to incorporate revisions to the 1989 Federal Manual and that both the Corps of Engineers and EPA agreed to adopt the 1987 Manual for purposes related to the Clean Water Act. *See* Nagy, 3 U. Balt. J. Envtl. L. at 95, 97.  Thus, even after August 1991, there was little certainty regarding the standards for wetland delineations until January 1993.

In light of this historical context and the letters from concerned West Ocean City residents, we are persuaded that the Department's desire to adopt the 1992 Policy was rationally related to a legitimate state interest in avoiding unfairness to those property owners who were impacted by the introduction of the 1989 Federal Manual and its resulting wetland determinations.  EPA articulated that fairness was an interest when it announced its approval of the 1992 Policy to the Baltimore District of the Corps of Engineers, "[w]e base our findings on one of fairness to local long range planning efforts."  The 1992 Policy clarified for all property owners

---

**29.**  Over 100,000 comments were submitted during the 210 day extended public comment period.  58 Fed.Reg. 4,995–01 (Jan. 19, 1993).

that the wetland delineation procedures in effect were those that existed at the time of the Consent Order and, in doing so, achieved a legitimate state interest.

The 1992 Policy was also rationally adopted with a legitimate interest in protecting the fiscal integrity of the sewer system. The Department and Worcester County each provided 12.5% of the funding for the sewer system, a value of approximately 2.3 million dollars. On July 15, 1991, the Director of the Department's Water Management Administration, J.L. Hearn, wrote to the Corps of Engineers expressing his concern with the financial status of the sewer system:

"[T]here was an agreement reached between NRDC, EPA, MDE and the Sanitary Commission that allows sewer service to be provided in the 100 year floodplain to lots platted prior to June 1, 1977 and lots containing wetlands, provided there is enough upland area on which to situate a house and its supporting facilities. Had it not been for these two allowances on service, the number of connections to the sewer system would have been limited to existing homeowners and 500–year floodplain development. These two groups alone could not have borne the entire local cost of the sewer system, and the decision would likely have been made in the planning stage not to go forward with the sewer project. Had this indeed been the decision, and [sic] the failing septic system problem there would continue to exist today.

"In configuring the layout of the West Ocean City sewer system, the service allowances and the information known at the time relative to floodplain and wetlands boundaries were taken into consideration. This was done by preparing drawings identifying environmentally sensitive areas. Thus, the planned sewer infrastructure and the later EPA grant were built upon a unique set of assumptions and conditions that carry considerable weight in deciding the fate of sewer service in the area. As such, I believe every effort should be made to permit sewer service to platted lots as originally planned. The financial integrity and the physical integrity of the system depend on this happening."

Appellants assert that there is no competent evidence demonstrating any existing or potential fiscal problem that was alleviated by the adoption of the 1992 Policy. We disagree. The letter by J.L. Hearn of the Department to EPA presents a conceivable state of facts that could provide a rational basis for the classification. *See Maryland Aggregates Ass'n,* 337 Md. at 674, 655 A.2d at 894. Even though the Worcester County Sewer District's district engineer and person responsible for all fiscal matters stated that, "[t]he District never had or foresaw any problem regarding its bond payments," it is undisputed that the Department had concerns about the fiscal integrity of the system.[30] Angelo Bianca, Administrator of Capital Projects Program at the Department, stated in his affidavit:

> "My concern arose of out my own experience ... that the ability of the locality to pay off even a small share of projects costs—typically no more than 12.5%—is a concern that runs through every project the Maryland Department of Environment funds.... I was concerned about the situation and felt that, if something was not done to correct for the application of the 1989 [M]anual, the Sanitary Commission may well begin to experience problems with the fiscal integrity of the system."

Mr. Bianca's comments and the letter from the Department to EPA demonstrate that the Department was worried about the impact of the implementation of the 1989 Federal Manual and the resulting denial of sewer service to unmapped lots. The Department's adoption of the 1992 Policy was rationally related to the Department's legitimate concern for the financial success of the sewer system.

---

**30.** The affidavit of Norman Connell, the WCSD's district engineer and the person responsible for all fiscal affairs also stated:

> "At no time, however, did the rejection or potential for rejection of sewer service to lots fronting on an originally installed sewer line (as to which the WCSD would have assessed and been collecting an annual front-foot charge) cause any fiscal problem or concern that such rejections might impair the District's ability to pay back its bond indebtedness."

Furthermore, the 1992 Policy is rationally related to the Department and the County's interest in adhering to the grant conditions imposed in the Consent Order which protect against development within the 100–year floodplain and wetlands as then defined. Richard L. Wells, the Worcester County Director of Environmental Programs, is responsible for implementing the Consent Order and his first affidavit submitted in the Circuit Court case stated as follows:

> "During the first few years of implementing the Consent Order, the system worked well. Although on-site delineations resulted in the discovery of some wetlands outside of those reflected on the wetland guidance maps, it was rare for a lot reflected as entirely upland on the guidance maps to be identified as wetlands through an on-site delineation."

The Department and the County had an obligation to satisfy EPA's grant conditions and it is rational and in no way arbitrary that the Department sought a return to a familiar policy, especially since the previous policy had implemented and satisfied EPA's requirements to ensure protection of floodplain and wetland areas. *See Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 656–57, 458 A.2d 758, 789–90 (1983) (stating that "a statutory classification enjoys a strong presumption of constitutionality" and the party attacking it must show by clear and convincing evidence that "it does not rest upon any rational basis, but is essentially arbitrary").

EPA, in response to the Department's request for the 1992 Policy, emphasized that the terms of the Consent Order gave the agency the right to restrict access to any lot within wetlands.[31] EPA went on to acknowledge that, "[w]e do, nevertheless, have an obligation to be reasonable in the exercise of the grant condition. Minor construction activity which affects jurisdictional wetlands outside of those mapped ... should not be constrained by [the restriction to not allow

---

**31.** EPA's February 27, 1992 letter reiterated that the requirement that service not be granted to areas within wetlands "does not restrict us to the wetlands designation shown on the maps if they do not coincide with jurisdictional wetland areas."

service to wetland areas]." EPA allowed this revised policy because the Corps of Engineers considers "avoidance and mitigation of wetland impacts" when determining whether or not to grant a building construction permit.[32] The Department recognized that the ecological commitments assumed in the Consent Order could not be waived and proposed a policy that maintained the general effect of the Consent Order.

The Department is not required to choose the fairest or best means of advancing its goals. *See Piscatelli,* 378 Md. at 644, 837 A.2d at 943 ("Further, a classification having some reasonable basis need not be made with mathematical nicety and may result in some inequality. If any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time the law was enacted must be assumed.") (quoting *Whiting–Turner Contract. Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985)). The 1992 Policy, and its reliance on mapped wetlands, is justified as a means to achieve the goals of fairness, fiscal integrity, and protection of ecological areas. Appellants can assert that the goals could be achieved through other means (*e.g.,* granting all pre-June 1, 1977 platted lots sewer service), but it is not this Court's role to determine the wisdom, fairness, or logic of the Department's line-drawing. *See Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2100–01, 124 L.Ed.2d 211 (1993)); *Harden v. Mass Transit Admin.,* 277 Md. 399, 414, 354 A.2d 817, 825 (1976) (quoting *Allied American v. Comm'r.,* 219 Md. 607, 624, 150 A.2d 421, 432 (1959)); *Hornbeck,* 295 Md. at 658, 458 A.2d at 790.

We hold that there is a rational relationship between the implementation of the 1992 Policy and the Department and Worcester County's desire to ensure fairness, fiscal integrity, and ecological protection of the sewer system service. We

---

**32.** The building construction permit process is governed by the Clean Water Act's Section 404 program, which regulates the discharge of dredged or fill material into the navigable waters. *See* 33 U.S.C. § 1342.

hold also that appellants have not demonstrated that they are similarly situated to the List of 26. Thus, appellants' equal protection claim fails.

## VIII.

We turn to the issue of whether the Department's denial of sewer service and wetland fill permits constitute an unconstitutional taking. Appellants' argument is that the Department's failure to give them sewer service and fill permits constitutes a taking of their property.

The Circuit Court, J. Eschenburg, found that no taking had occurred on the following grounds: (1) the sewer service and fill permit were not a taking because the lots were already undevelopable as of 1979 when they did not pass seasonal percolation testing, (2) prohibition of a nuisance does not constitute a taking and therefore denial of an on-site septic system on appellants' lots was proper, (3) the titles to appellants' lots required that the lots meet State and local septic regulations, (4) appellants never regained the right to develop their lots because the EPA grant that funded the sewer system prohibited service to lots in wetlands and under the 1992 Policy appellants' lots remain ineligible for sewer service, and (5) access to sewer service is not a constitutionally protected property interest. We agree with the conclusion of the Circuit Court and with all of the supporting grounds.

We briefly review federal takings law. It is axiomatic that private property may not be taken for public use without just compensation.[33] U.S. Const. Amend. V.[34] The

---

**33.** As stated in *Green Party v. Board of Elections*, 377 Md. 127, 166, 832 A.2d 214, 237 (2003), the Fifth and Fourteenth Amendments to the United States Constitution and Article III, § 40, of the Maryland Constitution have the same meaning and effect, and "it is well established that 'the decisions of the Supreme Court are practically direct authorities' " for both provisions (quoting *Bureau of Mines v. George's Creek*, 272 Md. 143, 156, 321 A.2d 748, 755 (1974)). *See also Allied American v. Comm'r*, 219 Md. 607, 616, 150 A.2d 421, 426–427 (1959).

**34.** The Fifth Amendment of the U.S. Constitution states, "nor shall private property be taken for public use, without just compensation."

Takings Clause of the Fifth Amendment to the United States Constitution does not prohibit regulation of property, but if a regulation goes too far, it will be recognized as a taking. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922); *Belvoir Farms v. North,* 355 Md. 259, 281–82, 734 A.2d 227, 240 (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)). Whether a particular regulation constitutes a taking depends on the particular circumstances of each case. It has been recognized that most regulatory takings cases should be resolved by balancing the public and private interests at stake, considering three primary factors: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. *See, e.g., Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *District Intown Properties Ltd. P'ship v. District of Columbia,* 198 F.3d 874, 879 (D.C.Cir.1999); *Dodd v. Hood River County,* 136 F.3d 1219, 1228–29 (9th Cir.1998).

A property owner who is denied all economically beneficial or productive use of his or her land in the name of the public at large has likely suffered a taking, unless the regulation prohibits a common law nuisance. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1022–30, 112 S.Ct. 2886, 2897–2901,120 L.Ed.2d 798 (1992). Causation is a necessary element to establishing a valid takings claim.[35] *See*

---

Article III, § 40 of the Constitution of Maryland states, "[t]he General Assembly shall enact no Law authorizing private property to be taken for public use without just compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation."

**35.** There has been little discussion of a causation requirement in federal takings cases. As the Ninth Circuit explained in *Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency,* 216 F.3d 764, 783 (9th Cir. 2000), *aff'd,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), "this is due to nothing more than the fact that, in most regulatory

*Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. The proximate cause requirement was addressed in *Penn Central* when the Supreme Court discussed the difficulty in developing a set formula for determining when "economic injuries *caused* by public action" require compensation because whether "losses *proximately caused* by" government regulation merit compensation largely depends "upon the particular circumstances" of the case. *Id.* (emphasis added). The "decisions of the Supreme Court are practically direct authorities" for the Fifth and Fourteenth Amendments to the United States Constitution and Article III, § 40, of the Maryland Constitution and we acknowledge that, as discussed in *Penn Central,* proximate cause is a necessary element to establishing a valid takings claim. *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974); *Allied American v. Comm'r,* 219 Md. 607, 616, 150 A.2d 421, 426–427 (1959).

Appellants have not demonstrated that the denial of their permits under the 1992 Policy was a proximate cause of their lots being undevelopable. In fact, it was the implementation of seasonal septic system testing that caused appellants' lots to be undevelopable, not the denial of fill permits or a sewer connection. Worcester County used seasonal testing starting in 1972; it was required by the State in 1976 through the GS–6 Policy, and appellants' lots failed seasonal testing in 1979. Appellants concede that the denial of an on-site septic system under the GS–6 Policy rendered their lots undevelopable until the possibility of sewer came to fruition and that they did not appeal this decision.[36]

Moreover, although the septic denials rendered appellants' lots undevelopable, the denials did not constitute a taking because they fall within the takings "nuisance exception" recognized by the Supreme Court in *Lucas.* Nuisances that are recognized at common law and prohibit all economi-

takings cases, there is no doubt whatsoever about whether the government's action was the cause of the alleged taking."

**36.** Appellants' lots are deed restricted to residential use.

cally beneficial use of land do not constitute a taking. *See Lucas*, 505 U.S. at 1028–29, 112 S.Ct. at 2900. As stated by the Supreme Court in *Lucas:*

> "We believe similar treatment must be accorded confiscatory regulations, *i.e.*, regulations that prohibit all economically beneficial use of land: Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise."

*Id. See also Richard Roeser Professional Builder, Inc. v. Anne Arundel,* 368 Md. 294, 318, 793 A.2d 545, 560 (2002).

Judge Cathell, then a Judge of the Court of Special Appeals and now a member of this Court, applied the nuisance exception in *Erb v. Department of Environment,* 110 Md.App. 246, 676 A.2d 1017 (1996). The court found that the denial of an on-site septic system does not constitute a taking where permitting the system would allow for the maintenance of a nuisance. *Id.* at 264–65, 676 A.2d at 1026–27. Writing for a unanimous panel, Judge Cathell explained as follows:

> "The regulatory scheme set up by the [Maryland Department of the Environment] does no more than could be accomplished under the nuisance laws of this State. Even if MDE's regulatory scheme—a scheme designed to prevent appellant from creating a nuisance on his property—were to leave his property economically barren, no compensation would be due because the State has a right—and, indeed, an obligation—to regulate against the creation of nuisances.

> \* \* \* \* \*

> "Appellant's property has not been taken for public use; rather, his development of it has been restricted to prevent

public harm. In general, a property owner must use his property so as not to injure others, and a state is allowed to promulgate regulations that achieve this result. Along the same lines, a property owner generally has the constitutional right to make any use of his property he desires, so long as he does not endanger or threaten the health and safety of the general public. Were appellant allowed to install a septic system, given the expert testimony that, in all likelihood, the system would fail, it would constitute a threat to public health. The State may prohibit such use, and the fact that MDE's regulations prevent appellant from enjoying his property in the manner he would like does not render the agency's actions a taking for which compensation is due. There is no right, and there has never been any, incidental to the use of private property to create, conduct, or permit a nuisance thereon. A regulation prohibiting a nuisance is not, and cannot be, the taking or interference with a right incident to the use of private property. A right to maintain a nuisance does not exist in the first instance."

*Id.* at 264–66, 676 A.2d at 1026–28 (citations omitted).

On-site septic systems failed in the West Ocean City area and, in particular, in the Cape Isle of Wight subdivision, and resulted in the contamination of drinking wells and creation of a public health hazard. *See Showell,* 316 Md. at 260, 558 A.2d at 391. The operation of an on-site septic system on appellants' lots most likely would have contributed to the contamination problem and constituted a nuisance. That contamination of drinking wells or the spread of other sewerage contaminants generally would constitute a nuisance and thus not be permissible. *See Lucas,* 505 U.S. at 1030, 112 S.Ct. at 2901; *Erb,* 110 Md.App. at 265, 676 A.2d at 1027. Thus, no taking occurred when the State denied appellants' permits for on-site septic systems in 1979.

Moreover, the express condition in appellants' deeds requires that any sewer system for the lots conform to State health requirements. The restriction is set forth in the deed as follows:

"No privy or other outside toilet facility shall be constructed or maintained on any lot. Septic tanks, sewage disposal systems and drinking water facilities shall conform to all requirements established by the Maryland State Department of Health and the Worcester County Maryland Health authorities."

Upon receipt or purchase of lots 8, 9, 10, and 11, appellants were subject to State imposed restrictions on their land ownership, as set forth in their title. The Department's denial of sewer service and the resulting deprivation of the lots' economically beneficial use was justified and did not constitute a taking because the proscribed use interests were not part of appellants' title to begin with and because of the State's background nuisance principles. *See Lucas*, 505 U.S. at 1027, 112 S.Ct. at 2899; *Erb*, 110 Md.App. at 266, 676 A.2d at 1027–28.

Appellants' lots have remained undevelopable since 1979 and remain undevelopable, despite construction of the sewer system and implementation of the 1992 Policy. Appellants assert that the 1992 Policy rendered their lots developable and thus a taking resulted when they were denied sewer permits under that Policy.[37] In their earlier contested case hearing, Administrative Law Judge Louis N. Hurwitz concluded that "under the 1992 policy Appellants' lots 8, 9, 10, and 11 remain ineligible for sewer service." The Department's final decision maker, A. Katherine Hart, agreed and ruled on November 16, 2001 as follows:

---

**37.** We agree with the Circuit Court's finding that appellants previously litigated their eligibility for sewer service under the 1992 Policy. As discussed *supra* Part V, an administrative agency's decision is given preclusive effect if the agency was acting in a quasi-judicial capacity, the issue currently presented was actually litigated before the agency, and resolution of the issue was necessary to the agency's decision. *Batson v. Shiflett*, 325 Md. 684, 701, 602 A.2d 1191, 1200 (1992). Each of these elements was met in the contested case hearing regarding the eligibility of sewer service under the 1992 Policy. In contrast, resolution of the contention that appellants were barred by collateral estoppel from arguing that their lots were similarly situated, *supra* Part V, does not merit preclusion because the issue was not necessary to the agency's decision in the contested case.

"The Proposed Decision correctly concluded that, as the Lots have been properly determined to be wetlands under the Consent Order, the 1992 EPA policy change did not apply, and the Lots remained ineligible for service. I find that this determination of ALJ Hurwitz is supported by the preponderance of the evidence in the record."

Appellants did not seek judicial review of this decision and instead filed the case *sub judice*. Thus, no taking resulted from the denial of sewer or wetland fill permits because the lots were already undevelopable as of 1979 and remained so even after implementation of the 1992 Policy.

■■■ Appellants' takings claim fails also because they have not demonstrated that access to sewer service is an interest that qualifies for protection as "property" under the United States or Maryland Constitution. *See Lucas*, 505 U.S. at 1031, 112 S.Ct. at 2901–02; *Front Royal*, 135 F.3d at 286–87 (4th Cir.1998) (determining that failure to confer the benefit of sewer service is not a taking because there is no constitutional right to government provided sewer service under Virginia law). In order to make a successful claim under the Takings Clause, appellants must establish first that they possess a constitutionally protected property interest. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–01, 104 S.Ct. 2862, 2871–72, 81 L.Ed.2d 815 (1984) (determining whether health, safety, and environmental data submitted to EPA is protected property under Fifth Amendment's Takings Clause); *Washlefske v. Winston*, 60 F.Supp.2d 534, 538 (E.D.Va.1999), *aff'd*, 234 F.3d 179 (4th Cir.2000) (noting that appellant must demonstrate a protected property interest before the court proceeds to the question of whether the use or regulation of that property constitutes a taking).

■■■ Appellants have not demonstrated that the denial of sewer service has interfered with interests "that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment purposes." *See Penn Central*, 438 U.S. at 124–25, 98 S.Ct. at 2659. In fact, appellants recognize that they do not have any

Constitutional right to sewer service. Appellants' reply brief asserts, "[a]ppellants' right to receive sewer service is not a right created or established by either the United States or Maryland Constitution." We agree. Appellants also fail to demonstrate a property interest established by "existing rules or understandings that stem from an independent source such as state law." *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164, 118 S.Ct. 1925, 1930, 141 L.Ed.2d 174 (1998) (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Appellants' deeds contain a restriction requiring that any sewage disposal system conform to State and County requirements and they have no right to maintain a nuisance. Worcester County decided to provide a government benefit in developing a sewer system for West Ocean City, but access to the system was limited to the terms of the Consent Order. Failure to provide a benefit does not constitute a taking.

Finally, we address briefly whether the denial of wetland fill permits constitutes a taking. Appellants' lots are deed restricted to residential use. Without sewer service, it is not possible for appellants to build on their lots. As we discussed, *supra*, appellants lost the right to develop their lots when their lots failed seasonal testing in 1979. Appellants have not regained the right to sewer access. The denial of wetland fill permits does not constitute a taking because even with fill permits, appellants' lots are undevelopable under traditional common law nuisance principles. We hold that the denial of permits in 2001 did not constitute an unconstitutional taking because appellants lack a constitutionally protected right to sewer service and the right to develop their lots was absent already from their bundle of rights as of 1979.

*JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.*